Lucile H. MEYER, Petitioner,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

COMMISSIONER OF INTERNAL REV-
ENUE, Petitioner,

v.

Leon R. MEYER, Respondent.

Nos. 18480, 18531.

United States Court of Appeals
Eighth Circuit.

Oct. 6, 1967.

Joseph A. Hoskins, Kansas City, Mo. for Lucile and Leon Meyer; Philip J. Erbacher, Kansas City, Mo., was with him on both briefs.

Robert Waxman, Atty., Dept. of Justice, for Commissioner of Internal Revenue in both cases. Mitchell Rogovin, Asst. Atty. Gen., and Lee A. Jackson and David O. Walter, Attys., Dept. of Justice, were with Robert Waxman, Washington, D. C., on the brief in case No. 18480.

Richard C. Pugh, Acting Asst. Atty. Gen., and Lee A. Jackson and David O. Walter, Attys., Dept. of Justice, were with Robert Waxman, Washington, D. C., on the brief in case No. 18531.

Before VAN OOSTERHOUT, BLACKMUN and MEHAFFY, Circuit Judges.

BLACKMUN, Circuit Judge.

Section 395 of the Bankruptcy Act, as amended, 11 U.S.C. § 795, is part of Chapter 11 relating to Arrangements. It provides (with exceptions not applicable here) that no taxable income shall be deemed to have been realized by a debtor by reason of a modification or cancellation of indebtedness in a Chapter 11 proceeding.[1] This rule, of course, is repeated in the income tax regulations. Treas.Regs. § 1.61–12(b) (1) (ii). For the corporation-debtor-taxpayer which has had an Arrangement confirmed under Chapter 11, this is all probably clear enough.

What, however, is the effect of that adjustment of indebtedness upon the debtor corporation's earnings and profits? The answer to this question becomes important when, subsequent to court confirmation of the Arrangement, the corporation makes a distribution.

---

1. "§ 795. Taxes; income or profit from modification of indebtedness

"Except as provided in section 796 of this title, no income or profit, taxable under any law of the United States or of any State now in force or which may hereafter be enacted, shall, in respect to the adjustment of the indebtedness of a debtor in a proceeding under this chapter, be deemed to have accrued to or to have been realized by a debtor or a corporation organized or made use of for effectuating an arrangement under this chapter by reason of a modification in or cancellation in whole or in part of any such indebtedness in a proceeding under this chapter: *Provided, however,* That if it shall be made to appear that the arrangement had for one of its principal purposes the evasion of any income tax, the exemption provided by this section shall be disallowed."

Similar and corresponding provisions are §§ 268, 520, and 679 of the Bankruptcy Act, 11 U.S.C. §§ 668, 920, and 1079, which are respectively, parts of Chapters 10, 12, and 13 having to do with Corporate Reorganizations, Real Property Arrangements, and Wage Earners' Plans. Sections 395, 268, 520, and 679 were all added by the Chandler Act of June 22, 1938.

The nature of that distribution (as income or as capital) in the hands of the receiving shareholder obviously has a direct income tax consequence for that shareholder. This is the primary issue before us here. Despite the fact that § 395, and the corresponding §§ 268, 520, and 679 of the Bankruptcy Act, 11 U.S. C. §§ 668, 920, and 1079, have been on the statute books for almost thirty years, this may be an issue of first impression.

The taxpayers are Leon R. Meyer and Lucile H. Meyer. They are husband and wife. The taxable year involved is the calendar year 1959. The Meyers filed separate income tax returns for that year on the cash basis.

The controversy centers on Lucile's tax. The Commissioner, by his 90-day letters, proposed deficiencies of $17,402.-09 and $40,101.55 in Lucile's and Leon's respective 1959 taxes. The Tax Court, in a decision not reviewed by the full court, determined deficiencies of $16,-149.16 and $1,918.02, respectively. Lucile petitions for review. Leon does not. The Commissioner, however, has filed a petition in Leon's case as a protective step against the possibility that the decision in Lucile's appeal is adverse to the Commissioner on a theory of constructive receipt on behalf of Leon.

The two cases are thus interdependent. They were consolidated for trial in the Tax Court. We consider them together here.

The Tax Court's findings and opinion are reported as Leon H. Meyer, 46 T.C. 65 (1966).

The facts are complicated. They are set forth in great detail at pp. 68–81 of 46 T.C., to which we make general reference. They need not all be repeated here. We outline those particularly pertinent for our review.

1. For a time prior to July 31, 1946, Leon and Lucile were equal partners in a jewelry business known as Meyer Jewelry Co., in Kansas City, Missouri.[2]

2. In 1946 the Meyers incorporated this business, with the same name, under Missouri law. All the partnership assets, except a small amount of cash, were transferred to the corporation in exchange for its assumption of the partnership liabilities and its issuance to Leon and Lucile, equally, of its $100 per Class A voting capital stock and its $50,-000, face value, 10-year promissory notes. The assets so transferred had aggregate carrying values of $315,899.22. The liabilities so assumed amounted to $206,-399.22. The corporation kept its books on the basis of the fiscal year ended June 30.

3. In 1947 these promissory notes of the corporation were exchanged by the Meyers at face value without accrued interest for $100 par Class B voting shares of the corporation. The Class B shares possessed annual dividend priority and were subject to redemption at par. This exchange capitalized the corporation's theretofore existing liabilities to Leon and Lucile and improved its statement for credit purposes.

4. No dividends were paid by the corporation on any of its outstanding shares during its fiscal years 1946–1958 inclusive.

5. By 1956 the corporation was in financial difficulty. An involuntary bankruptcy petition was filed against it on May 31 of that year. The corporation, as debtor, then proposed a Chapter 11 Arrangement with its unsecured creditors. This Arrangement called for (a) the contribution by Leon of $25,000 to the corporation as additional working capital; (b) a loan of $100,000 to the corporation from a Kansas City bank, the loan to be guaranteed individually by Leon and partially by others, and to require principal payments of $10,000 in six months and $5,000 per quarter thereafter; (c) the issuance by the corporation to Leon of 250 additional shares of its Class B stock; and (d) the payment of expenses and specified debts in

---

2. For further background see Meyer Jewelry Co., 3 B.T.A. 1319 (1926), and Meyer v. United States, 121 F.Supp. 898, 129 Ct.Cl. 214 (1954), cert. denied 348 U.S. 929, 75 S.Ct. 342, 99 L.Ed. 728.

full and all other debts only to the extent of 30%.

6. The agreement with the Kansas City bank for its loan to the corporation provided that, in order to secure Leon's guaranty, Leon and Lucile were to pledge with the bank most of the corporation's issued and outstanding shares which they then held. Leon, in order to raise his $25,000 contribution, cashed in a life insurance policy on his life, on which Lucile was the beneficiary, and borrowed $15,000 from the same bank. This loan was secured by 798 shares of Thiokol Corp., which had a then fair market value of about $30,000.

7. The adjustment in the corporation's debts, as proposed by the Arrangement, amounted to $189,785.42. Of this amount, $74,886.84 served to reduce the corporation's income tax bases in its retained assets, as required by § 396 of the Act, 11 U.S.C. § 796.

8. In anticipation of the Arrangement, the corporation's accountant set up an account, designated "Contributed Capital", on the corporation's books and credited that account in the amount of $178,211.16. This was the amount of the debts so discharged, less certain items. Also, the corporation's assets were appraised and their carrying values were brought into line with their then lower fair market values.

9. The proposed Arrangement was accepted by creditors to the extent required by the Act and on July 3, 1956, it was confirmed by the district court. Payment of claims was effected shortly thereafter.

10. In September 1958, by appropriate corporate action, the respective rights of the Class A and Class B shares were made identical.

11. In December 1958 and February 1959 Lucile effected gifts of certain shares of the corporation to the Meyers' son, Louis S. Meyer, to their son-in-law, Richard C. Burstein, and to Jack Becker, an officer but not related. Thereafter Lucile owned only 40 Class A shares and 250 Class B shares.

12. Meanwhile, the 798 shares of Thiokol stock which Leon had pledged to the bank as collateral for his $15,000 note had grown to 1,848 shares through stock dividends, splits and exercises of rights. In addition, the Thiokol stock had greatly increased in value.

13. By April 1959 a plan was evolved aimed at the elimination both of the corporation's indebtedness (by then reduced to $50,000) to the bank and of Lucile's investment in the corporation. This was made feasible by the substantial increase in the value of Leon's Thiokol stock. The plan was effectuated in April and May by (a) Leon's making a capital contribution to the corporation of 700 of his collateralized 1,848 shares of Thiokol; (b) the corporation's authorizing the sale of the shares so contributed; (c) the bank's releasing to a broker certificates for 700 shares with appropriately executed stock powers; (d) the issuance of new certificates in the broker's name for those shares; (e) the sale of 638 of the shares by the broker on the New York Stock Exchange for the account of the corporation; (f) the corporation's receipt of $81,328.17 for the 638 shares; (g) the corporation's use of $50,000 thereof to pay the balance of its note to the bank; (h) the corporation's payment of the $31,328.17 remainder in two checks to Lucile; and (i) the corporation's placing this $31,328.17 on its books as a debit in an account receivable from Lucile, it being the intent of the parties that these payments to Lucile were to be in ultimate redemption of Lucile's stock in the corporation. These steps were followed by (j) Lucile's delivery of her stock for redemption late in the summer of 1959; (k) an agreement by the parties (reached after June 30, 1959) that Lucile's stock was redeemed at par ($29,000) rather than at its greater book value ($37,337.50) as of June 30, 1959; and (1) the corporation's crediting the account receivable from Lucile to the extent of $29,000 and debiting its capital stock accounts in the same amount as of December 31, 1959.

14. The $2,328.17 difference, between the $31,328.17 and the $29,000 figures, was continued, with other very minor items, in the corporation's account receivable from Lucile. The record does not show that this balance was ever paid.

15. This left 62 shares of the 700 which had been transferred from Leon. Of these, 32 were reissued in Leon's name. The other 30 were transferred, at Leon's direction, half to Louis S. Meyer and his wife as joint tenants, and half to Richard C. Burstein and his wife as joint tenants. The corporation's books reflect no account receivable from Leon with respect to these 62 shares and he made no payment to the corporation on account of them.

16. Leon was president and a director of the corporation. Throughout its fiscal years 1959–62, inclusive, Lucile was vice-president of the corporation and received a salary.

17. Lucile's income tax basis in her stock in the corporation was $29,000.

18. Lucile and Leon maintained two joint checking accounts. On one of these, Lucile's name appeared first and the statements for this account were sent to her. On the other, Leon's name appeared first and the statements for that account were sent to him. The two checks issued by the corporation to Lucile for its shares were deposited in the first of these accounts. Leon's $15,000 note to the bank was paid by a check drawn on this account by Lucile. Lucile drew other checks on the account payable to Leon or utilized for his obligations or expenses.

19. The corporation's earned surplus on June 30, 1955, as shown on its federal income tax return for fiscal 1955, was $21,970.23. Its returns for succeeding fiscal years showed taxable loss or income as follows:

| | |
|---|---|
| Fiscal year 1956, loss of | ($132,582.37) |
| Fiscal year 1957, loss of | (16,147.89) |
| Fiscal Year 1958, loss of | (69,941.20) |
| Fiscal year 1959, income of | 66,007.10 |
| Fiscal year 1960, income of | 2,492.13 |

The 1959 income includes, and results from, reported gain of $81,228.17 on the sale of the 638 shares of Thiokol stock. The 1956 loss includes the writedown in inventory.

20. In its fiscal years 1955–60, inclusive, the corporation made charitable contributions somewhat in excess of the amounts allowed as income tax deductions although these excesses were not deductible, they served to reduce earnings. Thus the corporation's actual net income for fiscal 1960, when adjusted downward for its excess contributions in that year, was $2,117.13.

21. For present purposes and *apart* from the effect, if any, upon earnings of the debt adjustment in the Arrangement, it suffices to say that, as of the end of fiscal 1959, the corporation had a sizeable accumulated deficit in earnings and profits. If, however, earnings were increased by the excess of the Arrangement's debt adjustment, the corporation possessed accumulated earnings from which dividends of $31,328.17 could be paid in fiscal 1960.

The Commissioner, in his 90-day letter to Lucile, included the $31,328.17 paid by the corporation to Lucile as taxable income to her for her taxable year 1959 on the theory that this was dividend income to her. It is this inclusion which produces the deficiency in Lucile's tax now in controversy. In his 90-day letter to Leon the Commissioner included, among other adjustments, a like amount of dividend income to Leon. This was on the theory that Lucile's receipt was on Leon's behalf. The item of course, if it is income at all, cannot be income to both taxpayers.

The Tax Court held that the payments made to Lucile in the corporation's fiscal year 1960 were essentially equivalent to a dividend to her in calendar 1959, within the meaning of § 302(b) (1) of the Internal Revenue Code of 1954, 26 U.S.C. § 302(b) (1); that the adjustment of the corporation's indebtedness in its 1956 Arrangement, to the extent the reduction exceeded the statutorily required reduction in bases of the cor-

poration's assets, generated earnings and profits for the corporation; and that the entire distribution to Lucile in 1959 was a dividend includable, under the Code's § 301(c) (1), in her gross income. It also held that no part of the distribution was taxable to Leon.

Thus our basic question is whether the $31,328.17 is income under § 301(c) (1). If the answer to this question should be in the affirmative, we would have the additional question whether that income is taxable to Lucile or to Leon.

We pass, for the moment, our consideration of the intricate issue of dividend equivalency and proceed directly to what we regard as the threshold question and the heart of the matter, namely, whether the corporation in fiscal 1960 possessed earnings and profits (other than the current fiscal year's net income) from which a dividend, as defined in § 316(a) (1), includable in the recipient's gross income, could be paid.

Section 301 of the 1954 Code governs the taxation of distributions of property by a corporation to its shareholders. Section 301(c) (1) provides that that portion of a corporate distribution which is a dividend shall be included in gross income. Section 316(a) provides that the term "dividend" means any distribution of property to shareholders out of either accumulated or current earnings and profits. Section 312 has some concern with the computation of a corporation's earnings and profits. Nowhere in the Code, however, are corporate earnings and profits specifically defined. The regulations would fill this gap at least partially. Treas.Regs. § 1.312–6(b) brings into the computation of corporate earnings all exempt and nontaxable income and all items includable in gross income under § 61.

■ It has long been said that income may be realized by a taxpayer upon the cancellation of indebtedness and the amount canceled is then to be included in gross income. § 61(a) (12) of the 1954 Code; Treas.Regs. § 1.61–12(a). See

United States v. Kirby Lumber Co., 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131 (1931). But, as we have noted, § 395 of the Bankruptcy Act provides an exception to this rule when it states that "no income or profit, taxable under any law of the United States * * * shall, in respect to the adjustment of the indebtedness of a debtor in a proceeding under this chapter, be deemed to have accrued to or to have been realized by a debtor * * * by reason of a modification in or cancellation in whole or in part of any such indebtedness" in an Arrangement proceeding. The question, therefore, is whether, although the debt cancellation resulted in no generation of taxable income for the corporation, it nevertheless still effected the creation of earnings and profits for the corporation.

The Commissioner asserts that this aspect of the case is controlled by the First Circuit's decision in Bangor & A. R. R. v. Commissioner of Internal Revenue, 193 F.2d 827 (1 Cir. 1951), cert. denied 343 U.S. 934, 72 S.Ct. 770, 96 L.Ed. 1342, affirming the Tax Court's decision reported at 16 T.C. 578 (1951). This was an excess profits tax case. At issue was the amount of the taxpayer's excess profits tax credit for 1943. In 1942 the taxpayer purchased some of its outstanding bonds on the open market at prices less than their face value. It was said, 193 F.2d p. 828, that "It is undisputed that this bond profit was realized income within the general definition of [the]" 1939 Code, and that the taxpayer "would have been taxable upon the whole amount of the bond profit in 1942" except for its exercise of an option, available to it under § 22(b) (9) and § 113 (b) (3) of the 1939 Code and the applicable regulations, to exclude such profit from gross income and, instead, to reduce by the amount thereof, the bases of property it held. The taxpayer thus properly excluded the bond profit from normal tax and surtax net income for 1942. It sought, however, to add the profit to its earnings and profits as of the beginning of 1943. The effect of so doing would increase its invested capital

and excess profits credit and thereby serve to reduce its excess profits tax for 1943. The Tax Court and the First Circuit ruled that the bond profit, although realized in 1942, was, by the exercise of the option, not then recognized and was to be excluded from the computation of earnings and profits for excess profits tax purposes.

The First Circuit drew the distinction between exempt income, on the one hand, and income which is realized but not recognized, on the other. As to exempt income, it said, p. 829 of 193 F.2d, that "the only logical time" to take it into earnings and profits is when it is realized; that the concept of accumulated earnings and profits for the purpose of the excess profits tax was the same as that for the income tax; and that, therefore, exempt income which is received and left in the business as working capital is to be included in earnings and profits for excess profits tax purposes. But, as to realized but not recognized income, the court said, pp. 829–830, "the problem is quite different". Here Congress has determined that "the economic changes are not definitive enough to be given tax consequences" but are to "be taken account of later". The addition, by the Second Revenue Act of 1940, of § 115(1) of the 1939 Code relating to the effect on earnings and profits of nonrecognized gains was thought to be only a clarifying amendment and not one effecting a change in existing law. The court said, p. 831, that the underlying principle is that earnings and profits must be computed on the same basis as that employed in computing income subject to the income tax, that is, that gains are to be reflected in earnings when they are recognized.

To the same effect is Alabama By-Products Corp. v. United States, 137 F. Supp. 252 (N.D.Ala.1955), aff'd 228 F. 2d 958 (5 Cir. 1956).

We are inclined to the view that this First Circuit case is not controlling here. It was not a bankruptcy situation. It dealt with what concededly was income realized by the taxpayer or, as Judge Raum of the Tax Court described it, p. 580 of 16 T.C., the taxpayer "realized a taxable gain". The emphasis was on this realization of income. The Meyer corporation, instead, by the specific provisions of § 395, realized no income by the Arrangement. The First Circuit taxpayer had an option, and utilized it, to avoid income taxation in 1942 on its then concededly realized and otherwise taxable income and to apply the amount thereof in the reduction of bases of assets held, thus merely postponing the income tax consequence to what the court regarded as "an economically more significant event". Existent income and its allocation present an issue very different from that of statutorily declared absence of income. It is the latter with which we are here concerned.

■ We conclude that, under all the facts of the present case, the adjustment of the corporation's debts in its Arrangement did not result in the creation of earnings and profits for the corporation, with the dividend consequences which would otherwise ensue. We base this conclusion upon:

1. The specific and emphatic denial in § 395 of the Bankruptcy Act that by the Arrangement's debt adjustment "no income or profit, taxable under any law * * * shall * * * be deemed to have accrued to or to have been realized by a debtor * * *." This is a flat statutory nullification of any theory of income receipt. It is a positive denial, not a mere deferral of the tax recognition of realized income. And, for what the observation may be worth, the nullification applies to profit as well as to income.

2. The Chandler Act of 1938 was enacted after the 1931 decision in United States v. Kirby Lumber Co., supra. Thus, § 395 of the Bankruptcy Act and, indeed, the parallel §§ 268, 520 and 679 of that Act, all came into being after *Kirby Lumber*. This chronology supplies and supports an inference that these new and added sections of the Bankruptcy Act, denying the accrual or realization of income to a debtor by an adjustment of

its indebtedness, were adopted to overcome any possible adverse implication in the *Kirby* decision and others like it.

3. Claridge Apartments Co. v. Commissioner, 323 U.S. 141, 65 S.Ct. 172, 89 L.Ed. 139 (1944), seems to make this clear. That case concerned §§ 268 and 270 of the Act; these are those sections of the Corporate Reorganizations chapter corresponding to §§ 395 and 396. The Supreme Court referred to the *Kirby* case and the uncertainty which surrounded the question as to the realization of income from the adjustment of indebtedness. It noted "the conflicting pulls of policy involved in the revenue acts and in the bankruptcy legislation". It stated that § 268 "had no other object, and there was no other occasion for its being, than to free Chapter X reorganizations from the tax deterrents, including tax uncertainties, imposed by the existing revenue act provisions". It said that "One who followed the procedure could be assured he would not thereby run into tax consequences which would˙ be worse than the economic illness requiring that cure". See pp. 146–152 of 323 U.S., 65 S.Ct. p. 177–178. This language and this approach, it seems to us, are equally applicable to § 395. See 2 Mertens, Law of Federal Income Taxation (1961 revision), § 11.23.

▪ 4. The conviction that Congress, by its enactment of the Arrangements chapter of the Bankruptcy Act, meant to provide a means for the preservation of a going business which otherwise, because of overwhelming debt burden, would disappear from the economic scene, and that Congress, as a part of its aim and purpose, meant to avoid the deterrent effect of all adverse income tax consequences which otherwise might be conceived and which, if theoretically valid, would discourage the use of the Arrangement device. See Claridge Apartments Co. v. Commissioner of Internal Revenue, supra, p. 149 of 323 U.S., 65 S.Ct. 172, and Commissioner of Internal Revenue v. Motor Mart Trust, 156 F.2d 122, 125 (1 Cir. 1946).

▪ 5. The conviction that such congressional purpose was not confined to the corporate debtor's own income tax situation but extended to the debtor's accounting for all proper tax purposes. We do not read a partial limitation into § 395.

6. The conviction that the confirmation of the Arrangement did not and could not serve to create earnings and profits in the Meyer corporation out of its preexisting earnings deficit. the *Kirby Lumber* rule is not absolute and applicable to all debt adjustments. See, for example, Helvering v. American Dental Co., 318 U.S. 322, 63 S.Ct. 577, 87 L.Ed. 785 (1943). Compare Commissioner of Internal Revenue v. Jacobson, 336 U.S. 28, 69 S.Ct. 358, 93 L.Ed. 477 (1949). Furthermore, the *Kirby* rule has no direct application here for the Meyer corporation did not acquire its own obligations at a discount.

7. The feeling that the First Circuit case supports rather than stands against Lucile's position. The court there stated, 193 F.2d p. 831, that the underlying principle is that earnings and profits must be computed on the same basis as that employed in computing income subject to the income tax. If this is so, and the debt adjustment is not realized income, it should not constitute earnings and profits. See Commissioner of Internal Revenue v. Wheeler, 324 U.S. 542, 547, 65 S.Ct. 799, 89 L.Ed. 1166 (1945).

8. The Supreme Court has typified §§ 268 and 270 of the Bankruptcy Act as "essentially reorganization provisions" and as "essentially tax relief provisions", and has said that their primary object and function "were to provide tax relief for parties undertaking reorganization and to prevent the clogging effects of the existing tax laws upon the operation of the Chandler Act". Claridge Apartments Co. v. Commissioner of Internal Revenue, supra, footnote 35, p. 163 of 323 U.S., 65 S.Ct. 172, 184. See Commissioner of Internal Revenue v. Motor Mart Trust, supra, p. 126 of 156 F.2d. What the Supreme Court said of §§ 268 and 270 must have like application to §§

395 and 396. The emphasis, therefore, is on tax relief and the proper effectuation of the Bankruptcy Act, rather than upon the raising of revenue. This being so, we give priority to the bankruptcy purpose.

■ 9. Long ago, the Supreme Court defined income, for income tax purposes, "as the gain derived from capital, from labor, or from both combined". Eisner v. Macomber, 252 U.S. 189, 207, 40 S. Ct. 189, 193, 64 L.Ed. 521 (1920). Further, Treas.Regs. § 1.61–12(b), referring to discharge of indebtedness, speaks in terms of the "realization" of income and states that "income is not realized" by a reduction of indebtedness in an Arrangement. This is a flat disqualification on the plateau of non-realization.

■ 10. We draw no contrary inference from the fact that § 396 requires the decrease of basis of the corporation's property for the debt adjustment but not beyond the property's fair market value as of the date of the order confirming the Arrangement. The argument is that the statutory requirement of basis adjustment carries an implication that, to the extent the debt decrease exceeds the basis decrease, it must constitute earnings to the corporation. The fair market value limitation upon the basis adjustment requirement was added to the statute in 1940. Its omission in 1938 in the corresponding section in Chapter 10 has been characterized by the Supreme Court as "a plain blunder" which made the cure "worse than the disease". Claridge Apartments Co. v. Commissioner of Internal Revenue, supra, p. 151 of 323 U.S., 65 S.Ct. 172. Because Congress chose to adjust basis and thus to lessen available depreciation deductions and to afford an opportunity for the realization of greater capital gain when the asset is eventually disposed of, does not, it seems to us, imply that the excess debt adjustment over basis adjustment equates with corporate earnings realized forthwith. The statute certainly does not so provide or impose any such condition. We might expect to find the statute specific if the legislative intent had been

to that effect. And the technical creation of immediate earnings strikes us as being an even more vivid example of the cure being worse than the disease than was afforded in the *Claridge Apartments* situation by the mere possibility of "higher taxes resulting in later years from the absence of any depreciation base and in case of sale of the property acquired". P. 151 of 323 U.S., 65 S.Ct. p. 179. We revert to § 395's provision that "no income or profit taxable under any law * * * shall, in respect to the adjustment of the indebtedness of a debtor in a proceeding under this chapter, be deemed * * * to have been realized by a debtor * * *."

11. This situation, we think, differs from the one where a corporation receives what clearly is income but which is statutorily exempt. The usual example is interest on state or municipal bonds or on some of the older government bonds. Income of this kind, although exempt to the corporation for purposes of the federal income tax, nevertheless constitutes earnings and is a source of taxable distributions. See, generally, 1 Mertens, Law of Federal Income Taxation (1962 revision) § 9.32. That treatise observes, "Presumably, however, the receipt must have the characteristics of income to be included in earnings and profits". Debt adjustment, as we have noted, in some circumstances may have the characteristic of income but in other circumstances it does not. Where our governing statute is so positive in its denial of "income or profit" we place the present situation in the latter category.

We therefore conclude that the bankruptcy accounting for the corporation did not serve to create earnings and profits for it.

This leaves for determination the subsidiary question whether the existence of fiscal 1960 net earnings of $2,117.13 in the corporation resulted in taxable income to Lucile in that amount under §§ 302(b) (1) and 301(c) (1). This depends upon whether the distribution to her was essentially equivalent to a dividend. See Sachs v. Commissioner of In-

ternal Revenue, 277 F.2d 879 (8 Cir. 1960), cert. denied 364 U.S. 833, 81 S.Ct. 63, 5 L.Ed.2d 59; Sullivan v. United States, 363 F.2d 724 (8 Cir. 1966), cert. denied 387 U.S. 905, 87 S.Ct. 1683, 18 L.Ed.2d 622.

Under all the circumstances of this factually complicated case we cannot say that the Tax Court's determination on this issue is not a proper one. It is true that only Lucile's stock was retired. On the other hand, the closely held and family character of the corporation; its dominance by the Meyers; Lucile's continued connection with the corporation until June 30, 1962, as an officer and paid employee after her stock-holding terminated in 1959; the overriding effect of the constructive stock ownership rules of § 318(a); Lucile's free use of distributed funds in payment of Leon's obligations; the corporation's retention on its books of the account receivable from Lucile without interest, security or payment; the absence of any contraction of the corportion's business; and the corporation's accounting inaction with respect to the 62 shares reissued in Leon's name or at his direction, all reveal that this was a loosely held and loosely operated corporate enterprise and support the conclusion that there was dividend equivalency here to the extent of $2,117.13 to Lucile in 1959. Atlanta Biltmore Hotel Corp. v. Commissioner of Internal Revenue, 349 F.2d 677, 680 (5 Cir. 1965). This, after all, is a fact issue and it is not to be disturbed on appeal if it is supported by substantial evidence on the record as a whole, is not induced by an erroneous view of the law, and is not clearly erroneous. Idol v. Commissioner of Internal Revenue, 319 F.2d 647, 651 (8 Cir. 1963); United States v. Carey, 289 F.2d 531, 537 (8 Cir. 1961); Heman v. Commissioner of Internal Revenue, 283 F.2d 227, 230–231 (8 Cir. 1960). None of these conditions is present here.

We have carefully reviewed all other arguments advanced by the taxpayers. The conclusions we have reached make it unnecessary for us to pass upon many of these. As to the remainder, we conclude that they were correctly decided by the Tax Court or contain nothing of merit.

In view of the Commissioner's approach to Leon's case and his characterization of the petition for review as one filed merely for the purpose of protecting the revenue, we do not disturb the Tax Court's determination there.

The Tax Court's decision in Leon's case, No. 18,531, is affirmed. Its decision in Lucile's case, No. 18,480, is vacated and that case is remanded for a redetermination of the deficiency in tax for the calendar year 1959 in accord with the views herein expressed.