MELVIN and RUTH ROTH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Roth v. Commissioner
Docket No. 7094-74.
United States Tax Court
T.C. Memo 1977-426; 1977 Tax Ct. Memo LEXIS 15; 36 T.C.M. (CCH) 1742; T.C.M. (RIA) 770426; December 19, 1977, Filed *15 Petitioners owned 9.8 percent of the stock of K. Though some of the stock of K was publicly traded on the over-the-counter market, petitioners' stock was restricted because it had not been registered with the SEC. Held, fair market value of petitioners' stock determined. John M. Sullivan and Edwin P. Lee, for the petitioners. Rick K. Budd, for the respondent. SIMPSON
MEMORANDUM *16 FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined deficiencies in the petitioners' Federal income taxes of $9,469.12 for 1968 and $176,359.99 for 1969. The parties have settled some of the issues; the sole issue remaining for decision is the fair market value of 652,074 shares of unregistered common stock on December 26, 1969. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners Melvin and Ruth Roth were husband and wife and maintained their residence in St. Paul, Minn., at the time they filed their petition in this case. They filed their joint Federal income tax returns for 1968 and 1969 with the Internal Revenue Service Center, Kansas City, Mo.
The petitioners were the sole stockholders of Kingpin Foods, Inc. (Kingpin), from its incorporation until its liquidation. Prior to its liquidation, Kingpin acquired 3,361 shares of stock of Northern Enterprises, Inc. (Northern). Mr. Roth was elected to the board of directors of Northern in 1964 and continued in that capacity until September 30, 1968, when Northern merged with Kodiak, Inc. (Kodiak). For the remainder of 1968 and throughout 1969, Mr. *17 Roth was a member of Kodiak's board of directors. As a result of the merger between Northern and Kodiak, Northern stockholders received 194 shares of Kodiak common stock for each share of Northern stock. At that ratio, Kingpin received 652,074 shares of Kodiak common stock. In December 1969, Kingpin adopted a plan of liquidation pursuant to section 337 of the Internal Revenue Code of 1954. [1] Subsequently, all of the assets of Kingpin, including the 652,074 shares of Kodiak, were distributed to the petitioners on December 26, 1969. Kodiak is a Minnesota corporation which was organized in 1960. [2] Through a series of acquisitions and mergers, Kodiak had become a small conglomerate by 1969 engaged in several different businesses. Kodiak and its wholly owned subsidiaries manufactured and distributed ice and related products, engaged in the urban bus transportation business in Duluth, Minn., and Superior, Wis., manufactured and sold plumbing fixtures, owned and operated income-producing real estate and provided secondary real estate financing, *18 and produced storage tanks and aircraft refuelers. From 1963 to 1969, Kodiak paid no dividends and its earnings per share, including extraordinary income items, were as follows: Year Ending
Earnings Per Share
9/30/63
7 cents
9/30/64
10 cents
9/30/65
5 cents
9/30/66
11 cents
9/30/67
28 cents
9/30/68
2 cents
12/31/68 a
(1 cent)
12/31/69
20 cents
Excluding extraordinary income of 22 cents per share for the years ending September 30, 1967, and December 31, 1969, Kodiak's earnings were reduced to 6 cents per share and a loss of 2 cents per share, respectively. From 1967 through 1969, Kodiak's current assets exceeded its current liabilities, except that on December 31, 1968, its current liabilities were $7,087,274 and its current assets were *19 $5,304,550. On December 31, 1969, Kodiak had one class of common stock, of which 6,642,533 shares were outstanding. The 652,074 shares of Kodiak received by the petitioners from Kingpin represented approximately 9.8 percent of Kodiak's outstanding stock. The stock acquired by the petitioners had not been registered with the Securities and Exchange Commission (SEC). The petitioners had no contractual right to demand that Kodiak register the stock, and they never requested Kodiak to do so. Kodiak stock was not listed on a stock exchange, but some of the outstanding stock was publicly traded on the over-the-counter market. During 1968, the bid price on the over-the-counter market steadily increased from a low of 3-1/4 to a high of 6-5/8; during 1969, the bid price steadily decreased from a high of 7 to a low of 2-3/8. On December 26, 1969, the bid price was 2-5/8 and the asked price was 2-3/4. During 1970, the bid price generally declined and ranged between a high of 2-3/4 and a low of 1. Information regarding the number of shares of Kodiak common stock publicly traded for the years 1963 through 1969 was not available. However, on September 30, 1969, there were eight market *20 makers in Kodiak stock; and on March 31, 1970, there were six market makers. In their 1969 Federal income tax return, the petitioners valued the 652,074 shares of Kodiak common stock at $1 per share in computing the capital gain from the liquidation of Kingpin and in computing the charitable contribution deduction resulting from a gift of 30,000 shares of such stock to the Kingpin Foundation. In April 1974, the petitioners filed a claim for refund of income tax paid for 1969 in which the stock was valued at 75 cents per share. In May 1974, the Commissioner issued his notice of deficiency in which the stock was valued at $2 per share. Shortly thereafter, the petitioners filed a timely petition in which they invoked our jurisdiction under section 6512 to determine an overpayment, and the Commissioner does not dispute our jurisdiction over such claim. OPINION In this case, we are called upon to determine the fair market value of 652,074 shares of unregistered Kodiak common stock on December 26, 1969.
As a general proposition, the price at which a willing buyer will purchase property *21 from a willing seller, when neither party is acting under compulsion, and both parties are fully informed of all the relevant facts and circumstances, establishes fair market value. Bankers Trust Co. v. United States,518 F. 2d 1210, 1219 (Ct. Cl. 1975), cert. denied 424 U.S. 966 (1976); Staley v. Commissioner,41 B.T.A. 752, 769 (1940); Newberry v. Commissioner,39 B.T.A. 1123, 1129 (1939); see Rev. Rul. 59-60, 1959-1 C.B. 237. In valuing stock, the price at which stock is sold on a stock exchange often provides the best evidence of the value of such stock. See, e.g., W.T. Grant Co. v. Duggan,94 F. 2d 859, 861 (2d Cir. 1938); Frank v. Commissioner,54 T.C. 75, 98 (1970), affd. 447 F. 2d 552 (7th Cir. 1971); Moore-McCormack Lines, Inc. v. Commissioner,44 T.C. 745, 759 (1965); Staley v. Commissioner,supra;Newberry v. Commissioner, supra.When there are no contemporary sales of the stock, generally, the fair market value is the mean between the bid and asked prices on the valuation date. See *22 Bankers Trust Co. v. United States,supra;Meyer v. Commissioner,46 T.C. 65, 106 (1966), affd. on this issue 383 F. 2d 883 (8th Cir. 1967); Goldwasser v. Commissioner,47 B.T.A. 445, 455-457 (1942), affd. 142 F. 2d 556 (2d Cir. 1944), cert. denied 323 U.S. 765 (1944); cf. sec. 20.2031-2(b),(c), Estate Tax Regs.; Estate of McNary v. Commissioner,47 T.C. 467 (1967). On December 26, 1969, Kodiak stock was traded on the over-the-counter market at a bid price of 2-5/8 and an asked price of 2-3/4. Thus, the mean between such prices, or $2.6875, is the fair market value for a share of such stock when sold in a block of 100 shares. However, in some situations, this per-share price is not appropriate for valuing the particular block of stock at issue. See, e.g., Bankers Trust Co. v. United States,supra;Husted v. Commissioner,47 T.C. 664, 678-679 (1967); Moore-McCormack Lines, Inc. v. Commissioner,supra;Goldwasser v. Commissioner,supra.In this case, the parties agree that such a price *23 must be adjusted because of the fact that the stock was not registered and because of the size of the block to be valued; they disagree over the amount of such adjustment. The petitioners presented the testimony of an expert whose experiences included the management of a large investment company which purchased some unregistered stock. In judging the investment quality of Kodiak stock, such expert considered the businesses of Kodiak to be "prosaic"; he found that its annual earnings amounted to 2 cents a share and that its price-earnings ratio was 120 to 1; and he compared the results of an investment in Kodiak with the results of a purchase of corporate bonds. He concluded that the value of an unrestricted share would not exceed 43 cents. In his view, the purchases of unregistered stock by investment companies could not be used as a basis for valuing the petitioners' stock, because when investment companies bought unregistered stock, they did so from the issuer and they obtained registration rights. He suggested that if a purchaser could be found for the petitioners' stock, the discount would be 70 to 80 percent. He also asserted that the size of the block to be valued would *24 result in an additional discount. In his opinion, he doubted that anyone would be interested in purchasing the petitioners' block of Kodiak stock, but he suggested that a value of 40 cents a share would surely be generous. The Commissioner also presented the testimony of an expert. Such expert had served as an economist for a large investment company, and his duties included valuing the unregistered securities held by such company. In valuing the petitioners' block of Kodiak stock, he took into consideration the investment risks and the lack of marketability. He classified the petitioners' stock as a speculative investment in view of the nature of Kodiak's businesses, the steady decline in recurrent earnings, the absence of dividends, the 66-percent decrease in the market price of publicly traded Kodiak stock during 1969, and the extremely high price-earnings ratio. The restraints on marketability, such as the lack of registration with the SEC and the large block of stock involved, negatively influenced value. He found that the most frequent discounts for unregistered stock, which was publicly traded on the over-the-counter market after the restrictions lapsed, ranged between *25 30 and 40 percent, and occasionally exceeded 50 percent. He acknowledged that investment companies comprised the principal private placement market and computed the discounts applied by the following five investment companies: Investment Company
Discount Range
Median Discount
Value Line Special
Situations Fund
0-60%
25%
Value Line Development
Capital Corporation
10-65%
40%
Diebold Venture Capital
Corporation
20-50%
28%
Manhattan Fund, Inc.
9-19%
15%
Source Capital Inc.
10-35%
22.5%
He considered the petitioners' stock to be comparable to the unregistered securities purchased by the Value Line Development Capital Corporation which invested in speculative companies with recent significant innovations in technology, and in his initial report, he used the median discount of such company, or 40 percent, resulting in a price of $1.6125 per share for the petitioners' stock. However, in a supplemental report, he increased the discount to 50 percent, resulting in a price of $1.34375 per share, because of a 2-cent error in his first report in computing Kodiak's earnings for 1969 and because of various arguments made by the petitioners' expert in his *26 valuation report. Because of the experience of the petitioners' expert, we were impressed by his opinion that investment companies would hesitate to purchase the petitioners' block of Kodiak stock, but we were not otherwise impressed by his approach to valuation of the stock. It is evidence that in retrospect, the petitioners' expert considered Kodiak stock to be grossly overpriced in 1969. Comparing an investment in Kodiak stock with an investment in corporate bonds is of little help in determining the fair market value of the petitioners' stock. It may be that Kodiak's businesses were prosaic, that it had not paid dividends, that its earnings were declining, and that its price-earnings ratio was astronomical; nevertheless, in the over-the-counter market, investors were spending approximately $2.6875 for a share. In evaluating the testimony of the petitioners' expert, the conclusion is inescapable that his opinion was unduly influenced by his view that the Kodiak stock generally was, in 1969, worth far less than what it was selling for. On the other hand, the method used by the Commissioner's expert provides a more reliable indication of fair market value and has generally *27 been used for determining the fair market value of restricted stock. See LeVant v. Commissioner, 376 F. 2d 434 (7th Cir. 1967), revg. on other grounds 45 T.C. 185 (1965); Bolles v. Commissioner, 69 T.C.     (Nov. 30, 1977); Frank v. Commissioner, supra; Husted v. Commissioner, supra; Goldwasser v. Commissioner, supra. Such expert obtained objective evidence of the discounts which occurred in arm's length sales of similar stock, and such information furnished the most reliable indication of the discount to be applied in this case. The 50-percent discount, which he finally concluded was appropriate in this case, is a very heavy discount and reflects the view that an acquisition of the petitioners' block of stock was less attractive than the usual purchase of unregistered stock. Yet, in our judgment, the Commissioner's expert failed to give adequate consideration to some of the disadvantages of such block of stock, and therefore, his discount should be increased somewhat. In the first place, we believe that the Commissioner's expert gave inadequate weight to the fact that a purchaser *28 from the petitioners would not acquire registration rights. It appears that in virtually all of the purchases by investment companies, registration rights were acquired; here, the petitioners could not transfer such rights, and the lack of them would be of some significance to a purchaser. In the second place, the facts do not support some of his judgments as to the investment quality of the petitioners' stock. He considered that the advantages of conglomerate management and a wide market for the stock offset other disadvantages of the stock, but in fact, there was no evidence to indicate that the management was of exceptional quality or that there was a broad market for the stock. For these reasons, we have concluded that a 60-percent discount should be applied in determining the fair market value of the petitioners' block of Kodiak stock. Accordingly, after weighing all the evidence, we find and hold that on December 26, 1969, the fair market value of the petitioners' block of Kodiak stock was $1.075 a share. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. When the corporation was organized in 1960, it was known as The Organizational Co. Later in 1960, its name was changed to Kodiak, Inc., and in 1972, the name was again changed to Kodicor, Inc.↩
a. After the merger between Kodiak and Northern, Kodiak changed its accounting period from a fiscal year to a calendar year. Kodiak's unaudited earnings for the calendar year 1968 were 1 cent per share.↩