VERONICA ADSHEAD, Transferee, ET AL. [1], Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Adshead v. Commissioner
Docket Nos. 3263-72, 2399-74, 2430-74
United States Tax Court
T.C. Memo 1976-196; 1976 Tax Ct. Memo LEXIS 208; 35 T.C.M. (CCH) 843; T.C.M. (RIA) 760196; June 17, 1976, Filed; as amended Oct. 21, 1976; reconsideration granted *208 A corporation sold its assets as a going concern pursuant to a plan of complete liquidation under sec. 337. A separate provision in the contract for sale provided that the corporation and its sole shareholder would not compete with the buyers for a period of 10 years. The contract allocated $250,000 of the purchase price to the covenant which was executed by both the corporation and its sole shareholder. Held: The covenant has a basis in economic reality. The portion of the purchase price attributable thereto is therefore amortizable by the purchaser and is taxable to the seller as ordinary income. Held further: Since the transferee of the seller put the year in which the sale occurred at issue for the first time on brief and since consideration of such issue would result in substantial prejudice to respondent, we decline to decide this issue. Held further: Respondent's disallowance of depreciation deductions sustained. Held further: The selling corporation is not entitled to deductions for expenses incurred in connection with the sale of capital assets. Held further: The allocation of the consideration for the covenant between the selling corporation and *209 its sole shareholder, in her individual capacity, determined. Held further: The amount of the consideration for the covenant attributable to the selling corporation which is properly accruable in the year of sale determined. George McMillan,Russell L. Forkey, and Bernard A. Jackvony, for petitioner in docket No. 3263-72. Richard J. Bischoff,Richard H. Hunt,Samuel C. Ullman, and Leon O. Stock, for petitioners in docket Nos. 2399-74 and 2430-74. Paul R. Stanton, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION *210 STERRETT, Judge: Respondent determined deficiencies in petitioners' federal income taxes as follows: Taxable
Docket
Year Petitioner
Number
Ended
Deficiency
Veronica Adshead *
3263-72
12/31/65
$ 1,195.00
12/31/68
2,042.43
8/31/69
174,587.05
National Food Services, Inc.,
2399-74
9/30/70
15,480.20
National Food Services, Inc.,
2430-74
9/30/71
3,418.80
1755 Corporation, and
Willoughby's Restaurant, Inc.
*211 The issue in controversy common to these cases is whether a portion of the consideration paid by National Food Services, Inc. under a contract for purchase of a restaurant owned by 721969 Corporation, formerly Captain's Table, Inc., in fact represents payment for a covenant not to compete executed by the seller and its then president, Victoria Adshead, or in contradistinction represents payment for the goodwill and the trade name of the seller. The contract sets forth an allocation of the purchase price among the various assets sold and further states that $250,000 of the total consideration represents payment for the aforenoted covenant not to compete. Concomitant with the sale the 721969 Corporation adopted a plan of complete liquidation under the provisions of section 337. With respect to this issue respondent has taken inconsistent positions. In the Adshead case he determined that the portion of the payments contractually allocated to the covenant not to compete is in fact bona fide consideration *212 for the covenant and is therefore taxable as ordinary income. In the National Food Services, Inc. cases he determined that the same sum represents a capital expenditure for goodwill and denied the amortization deductions taken with respect thereto. Despite the inconsistent positions contained in his notices of deficiency, respondent merely seeks uniform treatment of the $250,000 and does not argue that we should sustain his determinations on this issue as to all parties. On brief, however, he has advanced as his preferred position the stance that the $250,000 was in reality for the covenant as set forth in the contract for sale. With respect to the Adshead case certain other issues are presented for our consideration. These are: (1) Whether the sale of the restaurant took place in 1968 or in 1969; (2) Whether the Corporation is entitled to deductions for depreciation for its taxable year ended August 31, 1969; (3) Whether the Corporation is entitled to deduct expenses incurred in connection with the sale of the restaurant; (4) Whether respondent erred in determining that the consideration for the covenant was taxable to the Corporation rather than to Adshead in her individual *213 capacity, and (5) Whether the consideration for the covenant was properly accruable in 1969. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, and the exhibits attached thereto, are incorporated herein by this reference. Petitioner, Veronica Adshead (hereinafter Adshead), formerly Veronica Hagmann, resided in Ft. Lauderdale, Florida at the time she filed her petition herein. In his notice of deficiency to Adshead, respondent determined that she was liable, as transferee of the assets of 721969, Incorporated, formerly Captain's Table, Inc. (hereinafter the Corporation) for deficiencies in income taxes determined to be due from the Corporation for its calendar years 1965 [2] and 1968 and for its taxable year ended August 31, 1969. The Corporation, prior to its dissolution, was a Florida corporation with its principal place of business in Deerfield Beach, Florida. It filed its corporate income tax return for its taxable year ended August 31, 1969 with the southeast service center, Chamblee, Georgia on February 16, 1970. *214 The record does not disclose where it filed its returns for the calendar years 1965 and 1968. The Corporation, the transferor, was liquidated on August 28, 1969 and thereupon transferred all its assets to Adshead. The parties in the Adshead case agree that the fair market value of the assets so transferred exceeds the deficiency (including interest) determined to be due from the Corporation; that Adshead is a transferee of assets within the meaning of section 6901; and that she is liable as such for any deficiency (including interest) we find to be due from the Corporation. Petitioner National Food Services, Inc. (hereinafter NFS) is a Florida corporation with its principal place of business in Deerfield Beach, Florida. Its corporate income tax return for its taxable year ended September 30, 1970 was prepared and filed on the accrual method of accounting with the district director of internal revenue, Jacksonville, Florida. 1755 Corporation and Willoughby's Restaurant, Inc. (hereinafter Willoughby's) are Florida corporations which at all times pertinent to this case were wholly-owned subsidiaries of NFS. NFS, 1755 Corporation, and Willoughby's filed a consolidated corporate *215 income tax return for their taxable year ended September 30, 1971 with the district director of internal revenue, Jacksonville, Florida. From 1956 until September 6, 1968 the Corporation operated Pal's Captain's Table Restaurant (hereinafter the restaurant) in Deerfield Beach, Florida, the operation of which was handled by Hank Hagmann until his death on November 8, 1965. [3]
Hank Hagmann, Adshead's late husband, was a man of considerable experience in the restaurant business having owned and operated five such enterprises during his 20 years in the restaurant field. Over the years he acquired a reputation as an excellent operator and his name was well-known among restaurateurs in the Deerfield Beach area. During the period in which he operated the restaurant he spent nearly every evening there and frequently greeted customers, many of whom knew him by sight if not by name. [4] Adshead, on the other hand, did not participate in, and knew very little about the operation of the restaurant prior to Hank Hagmann's death. *216 Upon Hank Hagmann's death Adshead became the sole shareholder of the Corporation and remained so until August, 1969 when the Corporation was liquidated. [5] Rather than attempt to run the restaurant herself, she entrusted its operation to her son who had worked there approximately 1 year in the capacity as doorman. Subsequently, in December 1967, she dismissed her son for lack of experience and retained a new manager whom she fired 6 weeks later. Adshead then proceeded to manage the restaurant herself, began to come to the restaurant daily, and made it her practice to greet customers. However, the restaurant, despite increasing sales, was experiencing financial difficulty and Adshead realized that she was not capable of operating it. In early 1968 she decided to dispose of the restaurant and authorized David Graham (hereinafter Graham), an attorney, to find a suitable buyer. Graham had previously become acquainted with Adshead in September or October *217 of 1967 when she retained him with respect to certain collection matters. When she requested his assistance in selling the restaurant he found it necessary to "hold off" creditors until a sale could be consummated. After an examination of the Corporation's books, which revealed that the restaurant had a large gross volume notwithstanding its operating deficit, Graham decided that the cash flow of the restaurant warranted its continued operation until it could be sold. Bert T. Laacks (hereinafter Laacks), presently a director, shareholder, and president of NFS, [6] is a man of considerable experience in the restaurant field having been engaged in that business for approximately 20 years. In July, 1968, he learned that the restaurant was for sale, and contacted Graham for the purpose of negotiating a purchase for his then employer, General Host Corporation. When General Host Corporation showed no interest in acquiring the restaurant Laacks, along with one Robert B. Knight (hereinafter Knight), continued to negotiate with a view toward acquiring the restaurant for themselves. The initial *218 meeting between Laacks, Knight and Graham took place in Graham's office on or around July 24, 1968. The discussions involved both a possible lease or purchase of the restaurant. At the meeting Graham told Laacks and Knight, who knew little about the restaurant, the following: (1) that the restaurant was a family business; (2) that the Hagmann name was very prominent in the area; (3) that Laacks and Knight were not to visit the restaurant for the purpose of making inquiries because prior prospective buyers had caused problems in so doing; (4) that he (Graham) had full authority to negotiate a sale since Adshead was busy managing the restaurant; (5) that the selling price was $1,300,000; and (6) that before negotiations could proceed further, a letter of intent to buy and a $20,000 nonforfeitable deposit would be required. In partial response, Laacks and Knight, fearing that Adshead might re-enter the restaurant business, told Graham that they would require her to execute a covenant not to compete. [7]
On July 24, 1968 Graham wrote a letter *219 to Laacks containing a proposal for the lease of, and an option to purchase, the restaurant's assets. That letter is set forth in pertinent part below. This letter is to confirm various aspects of the purchase or lease of the Captains Table Inc. as per our conversation of this date. You will be required to give $175,000.00 deposit - both as security for the performance of the lease and for the purchase of an option to buy the asset. Additionally, you will be required to pay $25,000.00 for the first three months' rental in advance - rental payments will then be monthly beginning January 1, 1969. We will agree to sell the inventory on the premises over twelve (12) equal installments for a period of one year with no interest. The option to purchase the asset will be for $1,500,000.00. We will work out some formula whereby some percent of the lease payment herein after set forth will be applied toward the purchase price, or in the alternative, there will be a formula established for the periodic reduction of the purchase price. The lease itself will be for 15 years with an option to renew for a similar term. The rental payment will be $100,000.00 per year. It will further *220 be agreed that the landlord will be responsible for repair and maintenance of the exterior, while the tenant will be responsible for the interior. The present owner will agree to keep both accounts payable and accounts receivable. With regard to the above described transaction, I will expect to receive a check made payable to David E. Graham Trust Account in the sum of $20,000.00 to be held as an earnest money deposit and to be applied toward the cash necessary to consummate this transaction. On July 31, 1968 Cromwell Anderson (hereinafter Anderson), in the capacity as attorney for Laacks and Knight, wrote a letter to Graham. This letter, written in response to Graham's letter of July 24, is set forth in pertinent part below. Confirming our conversation today, I wish to advise you that our clients are most interested in finalizing negotiations for the acquisition of the Captain's Table restaurant. Your proposal in your letter of July 24, 1968 is basically agreeable with Messrs. Knight and Laacks, whom I will hereafter refer to as the "partners". They agree to the $175,000 security deposit, although they would expect to receive 6.5% interest per year on this, since it *221 is a deposit. Alternatively, they would be willing to purchase all of the furniture, fixtures and equipment for some portion of the $175,000, in which event they would not expect to receive interest on the portion used for this purchase.
The partners agree that they will purchase the inventories of foods and beverages at their current market value, to be paid in twelve equal monthly installments, with no interest. Your client or clients would retain and be responsible for all of the currentand presently existing accounts payable and accounts receivable. The $25,000 for three months advance rent is agreeable with our clients. The rental payments of $100,000 per year in twelve equal monthly payments are acceptable, as is the term of the lease for fifteen years with an option to renew for a similar term. The partners agree that the landlord will be responsible for the repair and maintenance of the exterior, which would include plumbing and electric wiring and installation. The partners would be responsible for the repair and maintenance of the interior, which would include the furniture, fixtures and equipment. With respect to the option to purchase the assets, if the *222 partners exercised this option within eighteen months of the execution of the lease, they would arrange financing probably from a bank, in the sum of $600,000 and would pledge the physical assets as security for the bank loan. The total purchase price of all assets at that time would be $1,200,000 and the partners' total payments to your clients and the bank would be $120,000 per annum, the bank receiving payment on its obligation principal and interest first and the balance to your client. All amounts over and above the payments to the bank shall be applied toward the purchase price of the assets. The price of the physical assets would increase to $1,250,000 if the option were exercised five years after the date of the lease, and $1,300,000 if exercised ten years after the date of the lease. If exercised fifteen years after the date of the lease, the purchase price would be $1,350,000. The partners would arrange the same bank financing for the same $600,000 under any of the option alternatives above, and of course anything that had been deposited as security would be applied to the reduction of the amount needed as bank financing. The partners will require that they or their *223 corporation acquire ownership of the name "Captain's Table" or any derivation thereof. They also will require a non-compete agreement from the present owners covering a period of ten years and a geographical distance of ten miles from the restaurant. Also in response to Grahm's letter, on or about July 31, Laacks and Knight submitted to Graham the requested $20,000 deposit. After receiving the above letter, Graham drafted an agreement entitled "Agreement to Purchase and Sell" dated August 11, 1968 (hereinafter referred to as the August agreement). At Graham's request, Laacks and Knight appeared at his office on Sunday, August 11. Anderson was not advised of the meeting and consequently did not attend. Graham told Laacks and Knight that he had received another offer [8] and that an immediate commitment from them was required. Thinking they were compelled to sign or forego the purchase, Laacks and Knight executed the August agreement which had previously been signed by Adshead in both her individual capacity and as president of the Corporation. In Laacks' mind the August agreement committed them to the purchase of the restaurant. He did not, however, view it as a final expression *224 of the parties' intent since at that time he had received little information and many details were yet to be negotiated. The August agreement provided for the purchase of the restaurant including all the chattels, furniture, fixtures, equipment and inventory therein and the realty upon which the restaurant is situated. It further provided, in section 5 thereof, for the agreement of Adshead "not to become involved or engaged in the restaurant business within an area, the radius of which is fifteen (15) miles from the restaurant premises involved, for a period of ten (10) years from the date of closing this transaction." It also provided that the closing "shall be as soon as possible, but the closing, with respect to occupancy and prorations, shall be September 1, 1968." No allocation of the purchase price among the various classes of assets sold and the covenant not to compete appears in the August agreement. Graham mailed to Anderson, enclosed with a cover letter dated August 12, 1968, a copy of the August agreement, a copy of the legal description and survey of the real property owned by the Corporation, and a copy *225 of the appraised replacement value of the equipment owned by the Corporation as of February 4, 1965.(Hereinafter this appraisal will be referred to as the Kurman report.) [9] The letter of August 12 reads as follows: Dear Mr. Anderson: RE: Captain's Table Enclosed is a copy of a rather sketchy agreement regarding the sale of Captain's Table, Inc. I realize this agreement merely outlines the terms and the conditions of the sale; but at least we have a meeting of the minds at this point and a general understanding of what the parties will agree to. As soon as you have had a chance to read the agreement as drawn, please contact me with regard to any changes or modifications you would like to insert and, if agreeable with the parties, they will be made. In the event there are no changes, we should at least discuss the mechanical aspects of closing this transaction on or before September 1, 1968. I will expect to hear from you. Sincerely yours, (signed) David E. Graham On or about August 6, 1968, Laacks retained John Markham (hereinafter Markham) of *226 the firm of Horwath and Horwath, Certified Public Accountants, to review the financial statements of the Corporation. On August 6, 1968 Markham visited Graham who provided him with several financial statements of the Corporation which revealed the following: Approximate Profit
Approximate Period Covered
or (Loss)
Gross Sales
1/1/64 to 10/31/64
$27,073
$ 571,672
1/1/65 to 10/31/65
38,051
688,588
1/1/66 to 12/31/66
33,412
1,041,452
1/1/67 to 12/31/67
(49,327)
1,147,475
1/1/68 to 3/31/68
122,970
489,731 Because Markham considered the financial history incomplete he also examined the tax returns of the Corporation[10] and gave great weight to the sales history of the restaurant. Upon completion of his analysis he concluded that the goodwill of the restaurant was negligible and apprised Laacks of his finding. [11]
Horwath and Horwath was retained by Laacks and Knight also to inventory the restaurant's physical assets. The inventory, completed on or about August 19, 1968, was utilized *227 by Laacks and Knight to ascertain which assets appearing in the Kurman report were no longer in the restaurant and which assets therein had been purchased since February 5, 1965, the date of the Kurman report. By subtracting the value of the former and adding the value of the latter, they computed the total value of the tangible personal property to be $244,000. Negotiations continued throughout August, 1968 in an effort to effect closing by September 1, 1968. Discussions were held at various times with respect to the $20,000 deposit, problems Graham was having in delivering clear title, preparation of various documents, financing, and the allocation of the purchase price among the various assets and the covenant not to compete although final allocations were unattainable until completing the aforenoted physical inventory. After receiving the Horwath and Horwath report, Laacks, with the advice of his accountants, arrived at the following allocation of the purchase price among the various assets and the covenant: Asset
Value
Land
$200,000 [12]
Building
400,000 [13]
Physical Assets [14]
250,000    Covenant
250,000 [15]
*228 On August 27, 1968. Laacks, by telephone, transmitted these figures to Anderson who confirmed them with Graham on August 29, 1968. On August 31, 1968 a meeting was held to iron out the problems which had made closing impossible and to finalize the agreement between the parties. During the meeting the final contract of sale was negotiated and closing was extended for 10 days. Graham further was able to obtain the release of the $20,000 deposit and to obtain an additional deposit in the amount of $30,000. NFS then took possession of the assets of the restaurant on September 6, 1968 and commenced its operation thereof. On or about October 2, 1968 Graham transmitted to Anderson a new agreement dated September 6, 1968, signed by Adshead individually and as president of the Corporation. NFS executed an agreement which was executed by Adshead individually and as president of the Corporation on October 22, 1968, which agreement was entited "Purchase Agreement and Option to Lease" and was dated effective September 6, 1968. [16]
*229 The Purchase Agreement and Option to Lease dated September 6, 1968, by its terms, superceded the August agreement thereby rendering it void and of no force and effect. The September 6 agreement also contained the following provisions: (9) It is agreed that the purchase price shall be allocated as follows: Land
$ 180,000
Building
400,000
Chattels, equipment,
244,000
furniture and fixtures,
and such other personal
property located on said
premises and used in the
operation of said business.
Licenses (including liquor
1,000
licenses)
Good Will
25,000
Compensation for non-
250,000
competition clause as
hereinafter provided.
$1,100,000
Provided, however, the allocation of $400,000 to building shall be diminished by the cost of the aforesaid sprinkler system and the difference between the actual principal balance of the existing SBA mortgage at the time of closing and $150,000. * * *
(13) * * * a) Seller, in consideration of the sum of $250,000 and its officers, directors and stockholders, in order to induce the execution of this Agreement, agree not to become involved or engaged in the restaurant business within an area the radius of *230 which is 15 miles from the subject property for a period of ten (10) years from the date of the closing of this transaction, and Seller further agrees that Seller nor its officers, directors and stockholders will use the name "Pal's", [17] "Pals Captain's Table", "Captain's Table" or the family name of Hagmann, in connection with the operation of any restaurant within the above described area. The closing of the sale under the September 6 agreement was scheduled to take place on April 22, 1969. Although it did not occur until July 7, 1969, NFS, by its officers, Laacks and Markham, executed a promissory note in the principal amount of $610,000 and a purchase money second mortgage on the real estate to the Corporation on April 22, 1969. The promissory note secured by the purchase money second mortgage had a fair market value of $428,062 on July 7, 1969 and could have been sold on that date for this amount. The total consideration paid by NFS under the September 6 agreement consisted of the following: Deposit - July 31, 1968
$ 20,000.00
Deposit - August 31, 1968
30,000.00
Other Cash Deposits and Closing
254,516.24
Assumption of Loan from SBA
146,483.76
Purchase Money Second Mortgage
610,000.00
$1,061,000.00
*231 The reduction of the total consideration from that reflected in the September 6 agreement was agreed to by the parties thereto as an adjustment for the cost of the sprinkler system. On its federal income tax return filed by NFS for its taxable year ended September 30, 1970 and on the consolidated return filed by NFS, 1755 Corporation, and Willoughby's for their taxable year ended September 30, 1971, $25,000 was deducted as amortization of the cost of the covenant not to compete. [18] On January 8, 1974 NFS received its statutory notice of deficiency for these years from respondent on which respondent disallowed the aforenoted amortization deductions to prevent inconsistent tax treatment of the covenant not to compete. The Corporation on its return for its taxable year ended August 31, 1968 reported the sale as follows: 721969, Incorporated (formerly Captain's Table, Inc.) c/o Graham, Carroll & Hodge, P.A. 3081 East Commercial Boulevard Fort Lauderdale, Florida 33308 Form 1120 For Period Ended August 28, 1969 *232 Schedule D, Part 1, Gain from disposition of depreciable property
Date
Date
Gross
Cost and Kind of property
acquired
sold
sales price
expense of sale
Land, building and
improvements
(includes Sec.
1250 property)
1957-1965
7/7/69
$ 703,385
$532,394
Furniture and fixtures,
equipment and
personal property
1957-1969
7/7/69
70,652
305,030
Goodwill and licenses
Various
7/7/69
276,000
29,931
Cash and inventory
Various
7/7/69
10,963
10,963
$1,061,000
$878,318
Schedule D, Part 1, Gain from disposition of depreciable property
Depreciation Allowed
Prior to 1962/64
After 1961/63
Land, building and improvements
(includes Sec. 1250 property)
33,619
$107,918
Furniture and fixtures, equip-
ment and personal property
40,912
185,804
Goodwill and licenses
Cash and inventory
$74,531
$293,722
Schedule D, Part 1, Gain from disposition of depreciable property
Adjusted
Total
Ordinary
§ 337
basis
gain
gain
gain
Land, building and improvements
(includes Sec. 1250 property)
$390,857
$312,528 $18,197
$294,331 Furniture and fixtures, equip-
ment and personal property
78,314
(7,662)
(7,662)
Goodwill and licenses
29,931
246,069 $246,069 Cash and inventory
10,963
$510,065
$550,935 $ 18,197
$532.738 *233 The Company adopted a plan of complete liquidation and distributed all of the assets in complete liquidation within one year from the date of adoption of the plan. The above assets were sold after the adoption of the plan, and the gain (except for Sec. 1250 recapture) is not recognized under I.R.C. Section 337. Respondent determined that the proceeds from the sale of the restaurant should be allocated as follows: Kind of Property
Sales Price
Land, Building and Improvements
$ 525,600
Furniture, Fixtures, Personalty,
220,000
Cash, Inventory
Licenses and Goodwill
65,400
Covenant
250,000
$1,061,000
Respondent also disallowed depreciation deductions taken by the corporation on its returns for the 1968 calendar year in the amount of $11,347 and for its taxable year ended August 31, 1969 in the amount of $17,778 determining that the Corporation ceased to be in the restaurant business as of September 6, 1968. Hence, he disallowed all depreciation deductions attributable to the period September 6, 1968 to August 31, 1969. The difference between the amount of "depreciation allowed after 1961 and 1963" shown on the Corporation's final *234 return and as determined by respondent with respect to the sale at issue is attributable solely to this disallowance. OPINION Issue 1.Tax Treatment of Payments Allocated to the Covenant Not to Compete
The legal principles governing our resolution of this issue are clear. Amounts paid by a purchaser to a seller for goodwill result in capital gain to the seller and the acquisition by the purchaser of an intangible asset, the cost of which may not be amortized since goodwill normally does not have a limited useful life. Amounts paid by a purchaser to a seller for a covenant not to compete, on the other hand, result in the recognition of ordinary income by the seller, being a substitute for ordinary income, and may be amortized by the purchaser over the useful life of the covenant. J. Leonard Schmitz,51 T.C. 306, 313 (1968), affd. sub. nom. Throndson v. Commissioner,457 F. 2d 1022 (9th Cir. 1972). Section 1.167(a)-3, Income Tax Regs.
In his notices of deficiency in these cases respondent asserted inconsistent determinations in order to insure uniform treatment of the covenant not to compete. While he does not now contend that both of *235 his determinations should be sustained, respondent has endorsed the position of petitioners, NFS, 1755 Corporation, and Willoughby's. [19] Hence, he urges that we sustain his determination as to petitioner Adshead only. In view of respondent's present position we could deem that he has conceded this issue in the National Food Services cases. However, were we to adopt this course of action respondent would find himself whipsawed should we decide this issue in favor of petitioner Adshead. Petitioner Adshead, in turn, would be left with the suspicion that she was the victim of a conspiracy between respondent and the NFS petitioners should we decide this issue against her. We think that in fairness to all parties it is incumbent upon us to decide this issue in both the Adshead and National Food Services cases on the merits. Since the arguments and burden of proof in these cases differ, we will in the interest of clarity and fairness, treat them separately. A. The National Food Services Cases On its tax return for its taxable year ended September 30, 1970, NFS *236 deducted $25,000 as the amortization of the cost of the covenant not to compete which it asserts to be $250,000 as set forth in the September 6 agreement (hereinafter the contract for sale). On their consolidated return for their taxable year ended September 30, 1971 the NFS petitioners did the same. Respondent disallowed the deductions determining that the $250,000 in question represents the cost of acquiring a capital asset. The question of whether or not a contractual allocation of a portion of the purchase price of a business between a covenant not to compete and goodwill will be recognized for tax purposes has been the subject of considerable litigation. The myriad of cases in this area has resulted in the evolution of two distinct legal standards which courts have used as the backdrop against which to judge the tax ramifications of such an allocation--the severability standard and the economic reality standard. Rich Hill Insurance Agency, Inc.,58 T.C. 610, 616 (1972). The Fifth Circuit, to which an appeal in the instant case would lie, has adopted the economic reality test. Balthrope v. Commissioner,356 F. 2d 28, 31 (5th Cir. 1966); *237 Barran v. Commissioner,334 F. 2d 58 (5th Cir. 1964). The substance of the economic reality test is a determination of whether or not the covenant not to compete has an independent basis in fact or some relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement. Schulz v. Commissioner,294 F. 2d 52, 55 (9th Cir. 1961). Put somewhat differently the NSF petitioners must demonstrate that the payments allocated to the covenant not to compete were not in fact payments for something else. Welch v. Helvering,290 U.S. 111 (1933). Balthrope v. Commissioner,supra at 31. [20]
The NFS petitioners have advanced two arguments in support of their position. First, they contend that the parol evidence rule is applicable to the instant proceeding and operates to bar all evidence that varies the terms of the contract for sale.Hence, they urge *238 that the contractual provision allocating $250,000 to the covenant not to compete is dispositive of this issue. They also argue that they adduced at trial evidence sufficient to demonstrate that the covenant does in fact have a basis in economic reality. The NFS petitioners' reliance on the parol evidence rule is without merit. The parol evidence rule applies between the parties or privies to a written agreement. This, however, is not the situation before us. The Adshead and Natonal Food Services cases are proceedings each involving a taxpayer on one side and respondent on the other. Since respondent was not a party to the contract for sale the NFS petitioners cannot invoke the parol evidence rule against him. Walter Lacy,39 T.C. 1100 (1963), affd. 341 F. 2d 54 (10th Cir. 1965). To hold otherwise would allow a taxpayer to bind respondent by the form in which the taxpayer chooses to cast his transaction. However, it is, well-settled that it is proper for respondent to look through he form of a transaction to its substance in order to determine the correct tax consequences thereof. A taxpayer cannot contractually preclude respondent for attacking *239 an allocation which has no basis in economic reality. Dixie Finance Company, Inc. v. United States,474 F. 2d 501, 504 (5th Cir. 1973). The NFS petitioners, however, have established to our satisfaction that the covenant does have a basis in economic reality. The covenant was the subject of considerable discussion and was of great importance to Laacks and Knight. Laacks testified that without the execution of the covenant by Adshead he would not have purchased the restaurant and that he made this clear to Graham during their initial meeting. He further testified that negotiations with respect to the covenant, and the portion of the purchase price to be allocated thereto, continued throughout August, 1968 and that he arrived at the final value placed thereon shortly after receiving the information from Horwath and Horwath relative to the assets being purchased. Although conflicting evidence was presented on behalf of Adshead to the effect that no such negotiations took place until after September 6, 1968, Laacks' testimony was confirmed by that of Anderson whom we found to be a most credible witness. Anderson testified that Laacks informed him of the allocation *240 of the purchase price on August 27, 1968 and that Graham agreed to those figures on August 29, 1968.
More importantly, we think the evidence makes clear that the $250,000 allocated to the covenant was not in reality additional consideration for any other asset above that set forth in section 9 of the contract for sale. The testimony of the expert witnesses concerning the various assets transferred establishes that the allocations in the contract for sale comport with economic reality. In this connection, we find Laacks' testimony with respect to the method he employed inmaking these allocations to be convincing. Moreover, we have no doubt that the facts presented strongly indicate that the covenant was not necessary to effectuate a transfer of goodwill. If anything, the evidence demonstrates that the restaurant had little or no goodwill in August, 1968. Finally, a careful examination of the record convinces us that the covenant was anything but an artificial device inserted by NFS solely for tax purposes. Adshead was in good health and possessed the physical capacity to compete. Although lacking experience in the restaurant business she could, if she so desired, have affiliated *241 herself with an experienced operator to utilize his experience and her family name. At all times during the negotiations she was represented by counsel and testified that she understood the meaning of the covenant at the time she signed the contract. We hold that the covenant not to compete has a value of $250,000 as set forth in the contract for sale.
B.The Adshead Cases Respondent in his notice of deficiency mailed to Adshead determined that the $250,000 at issue was for the covenant not to compete.Thus, the burden is on Adshead to adduce strong proof to overcome specific allocations set forth in the contract for sale. Balthrope v. Commissioner,supra at 32; Barran v. Commissioner,supra at 63; Schulz v. Commissioner,supra at 55. [21]
*242 We agree with respondent that Adshead's efforts to make the requisite showing have fallen woefully short of the mark. The heart of her argument is that the $250,000 was, in reality, consideration for the trade name and goodwill of the Corporation and that the contractual allocation at issue was merely a tax device for the benefit of NFS. In support of this contention she relies heavily on the testimony of Graham who stated at trial that no allocations were discussed until after NFS took possession of the restaurant [22] and on the fact that she was not capable of operating the restaurant. In effect she has attempted to portray herself as the victim of overreaching by NFS. The evidence simply fails to support these contentions. First, Adshead failed to proffer any evidence, whatsoever, that the Corporation possessed goodwill in excess of the $25,000 allocated thereto in the contract for sale. Secondly, *243 the testimony of Graham is belied by that of Anderson whose demeanor and honesty considerably impressed us. [23] Third, even though Adshead was not capable of managing the restaurant, Laacks and Knight possessed a genuine fear of competition and, as noted above, Adshead could have affiliated herself with an experienced restaurant owner. Finally, we do not believe that any overreaching occurred in connection with the sale of the restaurant. At all pertinent times Adshead was represented by an attorney. We hold that Adshead has failed to sustain her burden of proof on this issue. Issue 2. The Year of the Sale
On brief, Adshead asserts for the first time that the record demonstrates that the sale of the restaurant occurred in 1968. She argues that respondent therefore erred in determining that the Corporation realized and recognized any income therefrom in 1969. Respondent contends that this issue was not timely raised and that the facts show that the sale took place in 1969. We agree with respondent that Adshead *244 has not properly raised this issue and for this reason decline to consider it. It is well settled that new issues may not be raised for the first time on brief. Eleanor C. Shomaker,38 T.C. 192 (1962); Estate of Akos Anthony Horvath,59 T.C. 551 (1973). Respondent, in his notice of deficiency, did not phrase his determinations in broad or ambiguous language. Adhead's petition, also specifically drafted, set forth many assignments of error with respect to those determinations including several pertaining to the proper timing of the recognition of the gain from the sale. However, each such reference was made in conjunction with either the issue of whether or not the entire amount of gain should be recognized in the year of sale, whatever that year might be, or whether the Corporation was entitled to depreciation deductions for its last taxable year. In none of her pleadings did Adshead allege that the sale occurred in 1968. Furthermore, our consideration of this issue would result in surprise and substantial disadvantage to respondent. In light of the manner in which the pleadings were drawn and the actions of respondent at trial, it is apparent *245 that respondent was totally unaware that petitioner was placing the year in which the sale occurred at issue.As a result he mae no effort at trial to explore fully the question of which party to this proceeding bore the benefits and burdens of ownership as of December 31, 1968. See Gordon J. Harmston,61 T.C. 216 (1973), affd. 528 F. 2d 55 (9th Cir. 1976). In this connection, we note that Adshead, in her petition, did not contest respondent's determination with respect to the Corporation's taxable year 1968 and we are without jurisdiction over the deficiency for that year. Richard A. O'Neil,66 T.C. 105 (1976). We are now to consider this issue and find that 1968 was in fact the year of sale for tax purposes respondent might well lose a portion of the tax resulting from the sale to which he would otherwise be entitled. From the respondent's point of view that is as prejudiced as he can get. Issue 3. Deductions for Depreciation
Adshead asserts that in the event we find that the sale took place in 1969, we must also hold, as a necessary corollary, that the Corporation is entitled to the depreciation deductions claimed on its *246 return for its taxable year ended August 31, 1969. We do not agree that we are under any such compulsion. As noted previously we decline to decide whether 1968 is the year of sale for tax purposes rather than 1969 as determined by respondent. However, assuming arguendo that the sale took place in 1969, it does not follow that the Corporation is entitled to depreciation deductions for that year. Stripped to its bare essentials the thrust of Adshead's argument is that the Corporation's ownership of the restaurant automatically entitles it to depreciation deductions with respect thereto. Clearly Adshead's argument proves too much, ignoring as it does the language of the governing statute. Section 167, [24] in pertinent part, provides for the allowance of deductions for depreciation of property that is either used in a trade or business or is held for the production of income. The evidence clearly indicates that subsequent to September 6, 1968 the Corporation ceased to operate the restaurant. No matter whether the sale took place in 1968 or 1969, the fact remains that after September 6, 1968 the restaurant, in the hands of the Corporation, was neither property used in its *247 trade or business nor property held for the production of income. We hold that respondent's disallowance of the depreciation deductions at issue was entirely proper. Issue 4. Deductibility of the Selling Expenses
Adshead advances the contention that the selling expenses not attributable to the covenant not to compete incurred by the Corporation in connection with the sale of the restaurant are deductible under section 162 as ordinary and necessary business expenses. [25] In support thereof she cites United States v. Mountain States Mixed Feed Company,365 F. 244 (10th Cir. 1966) wherein the Tenth Circuit held attorney's fees incurred in connection with a section 337 sale to be deductible as an ordinary business expense. *248 This issue has been presented to this Court on various occasions. Pridemark, Inc.,42 T.C. 510 (1964), revd. 345 F. 2d 35 (4th Cir. 1965); Of Course, Inc.,59 T.C. 146 (1972), revd. 499 F. 2d 754 (4th Cir. 1974). It has consistently been the position of this Court that expenses incurred in connection with a section 337 sale of capital assets are not deductible. In light of our discussion in Of Course, Inc., wherein we fully set forth our views on this question, no useful purpose would be served by repeating our analysis of this issue. We adhere to our prior decisions and hold that the selling expenses attributable to the capital assets sold by the Corporation are not deductible. See also Alphaco, Inc. v. Nelson,385 F. 2d 244 (7th Cir. 1967); United States v. Morton,387 F. 2d 441 (8th Cir. 1968); Lanrao, Inc. v. United States,422 F. 2d 481 (6th Cir. 1970), cert. denied 398 U.S. 928 (1970), Connery v. United States,460 F. 2d 1130 (3rd Cir. 1972); Page v. United States,524 F. 2d 1149 (9th Cir. 1975). Issue 5. Allocation *249 of the Consideration for the Covenant
Respondent, in his notice of deficiency, determined that the entire $250,000 allocated to the covenant was attributable to and taxable to the Corporation.Adshead takes the position that the proceeds attributable to the covenant are taxable to her in her individual capacity, rather than to the Corporation. The burden of proof on this issue rests on Adshead who failed to proffer any evidence that would support her position or in any manner aid us in allocating the $250,000 between the Corporation and her. To uphold respondent's determination on this basis, however, would unjustly penalize Adshead due to the peculiar interconnection of the various issues she has raised. As noted above her primary argument herein is that the covenant was entirely worthless. Manifestly, it would have greatly prejudiced her presentation of evidence with respect to that issue, had we required her to adduce evidence with regard to the value of her execution of the covenant in her individual capacity (as opposed to the value of the execution of the covenant by the Corporation). Rather, after careful consideration of the entire record, giving great weight to the *250 testimony of Henry Bojanek who testified that Adshead became familiar with a number of the restaurant's patrons, we believe that we are justified in concluding that $25,000 of the $250,000 consideration for the covenant is attributable to Adshead in her individual capacity. [26]Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930). Issue 6. Accruability of the Proceeds Attributable to the Covenant
Having found that the covenant has a basis in economic reality, we address ourselves to Adshead's contention that the portion of the total contract price attributable to the covenant was not property accruable by the Corporation in its final taxable period. In support of her position Adshead maintains that the Corporation received no payments from NFS in consideration for the covenant during its last taxable period. She further argues that all the events fixing *251 the Corporation's right to such payments had yet to occur by the termination of that period. The facts clearly belie any contention that the Corporation did not receive any payments in consideration for its execution of the covenant not to compete. In particular, the parties have agreed that prior to the closing (on July 7, 1969), the Corporation received the following consideration from NFS pursuant to the September 6 agreement: Cash
$ 304,516.24
Purchase Money
610,000.00
Money Mortgage
Assumption of Loan
146,483.76
$1,061,000.00 The parties further agree that the note and mortgage had a fair market value of $482,062 on July 7, 1969. In light of these stipulations we think it obvious that the Corporation received payment in the amount of $879,062 under the September 6 agreement of which $859,062 became subject to its unfettered control during its final taxable period. [27] See Schlude v. Commissioner,372 U.S. 129, 137 (1963). Hence, payment in consideration of the covenant was received by the Corporation during its final taxable year in an amount which bears the same proportion to $225,000 (the consideration for the covenant we have found *252 to be attributable to the Corporation) as $859,062 bears to $1,036,000 *(the total contract price less the consideration for the covenant we have found to be attributable to Adshead), that amount being $186,752.60. We agree with Adshead that all events fixing the Corporation's and her right to the consideration for the covenant had not occurred since such consideration had to be earned over the passage of time by the act of not competing. We disagree, however, with her legal conclusion. It is well settled that advance payments received by a taxpayer, without restriction as to their use, for consideration to be subsequently furnished are taxable in the year received. Schlude v. Commissioner,supra;American Automobile Assn. v. United States,367 U.S. 687 (1961); United States v. Williams,395 F. 2d 508 (5th Cir. 1968). We have continually rejected the deferral of reporting prepaid income on the theory *253 that it has not yet been earned by the performance of services. Standard Television Tube Corp.,64 T.C. 238 (1975); S. Garber, Inc.,51 T.C. 733 (1969). Thus, the Corporation must recognize income in the amount of $186,752.60 (less the amount of the selling expenses allocated to the covenant) for its taxable year ended August 31, 1969 as payment received for the covenant not to compete. Decision will be entered for petitioners in docket nos. 2399-74 and 2430-74.
Decision will be entered under rule 155 in docket no. 3263-72*
Footnotes
1. Cases of the following petitioners are consolidated herewith: National Food Services, Inc., docket No. 2399-74; National Food Services, Inc., 1755 Corporation, and Willoughby's Restaurant, Inc., docket No. 2430-74.↩
*. The deficiencies were determined against petitioner in this case as transferee of the assets of 721969, Incorporated, formerly Captain's Table, Inc. under section 6901.↩
2. Adshead has not contested respondent's determination for the Corporation's calendar years 1965 and 1968.↩
3. It is unclear from the record whether the stock of the Corporation was owned by Hank Hagmann, Adshead, or both prior to the death of Hank Hagmann.↩
4. His name was displayed prominently on the front of the restaurant's menu. According to the testimony of the maitre d' of the restaurant, patrons continued to ask for him several years after his death.↩
5. During the period July, 1968 through August, 1969 the officers and directors of the Corporation were: ↩
President
Adshead
Secretary
David Graham
Directors
Adshead
David Graham
James H. Carroll
6. NFS was incorporated in September, 1968 for the purpose of acquiring the restaurant.↩
7. Laacks testified that they never bothered to have her son also execute such a covenant since he was no longer in the area.↩
8. Apparently Graham had not received such an offer.↩
9. The Kurman report showed a total replacement value for the restaurant's equipment in the amount of $214,346.11.↩
10. He was not given the books of the Corporation. ↩
11. Although unclear from the record it appears that he reported his findings to Laacks on August 8, 1968.↩
12. Laacks testified that the value of the land was arrived at by the comparative sales method. ↩
13. Laacks testified that he arrived at the value of the building my multiplying the 20,000 square feet contained therein by $20 per square foot, which he stated was the "going price" at that time. ↩
14. The physical assets comprised the chattels, inventory, furniture, and fixtures. ↩
15. Laacks testified that he thought he could generate a profit of $100,000 per annum based upon the restaurant's sales figures. He estimated that Adshead could draw from him between 25 and 40 percent of the present clientele and thereby arrived at $250,000 as the value of the convenant.↩
16. These agreements are identical. After receipt of the October 2 agreement Laacks' attorney had it retyped and reexecuted due to numerous handwritten insertions appearing thereon.↩
17. "Pals" was, in a sense, a trade name employed by Hank Hagmann.↩
18. NFS also deducted $25,000 as amortization of the cost of the covenant for its taxable year ended September 30, 1969. That year, however, is not before us.↩
19. For convenience, hereinafter NFS, 1755 Corporation and Willoughby's will be collectively referred to as the NFS petitioners.↩
20. Since the NFS petitioners do not seek to upset the contractual allocation, the strong proof rule is not applicable to them. See Freeport Transport, Inc.,63 T.C. 107↩ (1974).
21. Adshead has taken the position that the strong proof rule is inapplicable since respondent in his notice of deficiency failed to follow any of the allocations set forth in the contract for sale other than the allocation pertaining to the covenant not to compete. We disagree. With respect to those assets upon which respondent has placed a value different from that appearing in the contract the burden of proof necessary to overcome respondent's determination is no different than that borne by any petitioner appearing before this Court. Rule 142, Tax Court Rules of Practice and Procedure.Welch v. Helvering,supra↩.However, where respondent's determination is in accord with a specific contractual allocation, strong proof must be adduced to overcome that declaration.
22. Apparently Adshead would have us believe that the August agreement was the operative agreement with the contract for sale being no more than a tax device. This position is clearly contradicted by language in Graham's letter of August 12 and the testimony of Laacks.↩
23. The direct conflict in testimony between Anderson and Graham is particularly distressing since both are attorneys and, as such, officers of the Court.↩
24. SEC. 167. DEPRECIATION. (a) General Rule.--There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)--. (1) of property used in the trade or business, or (2) of property held for the production of income.↩
25. The parties agree on the treatment to be accorded the portion of the selling expenses attributable to the covenant not to compete.↩
26. In accordance with our resolution of this issue we also hold that the total contract price of the September 6 agreement as it pertains to the Corporation is $1,035,000. Obviously the expenses of sale must also be reallocated among the covenant and the various assets sold in the Rule 155 computations.↩
27. The initial deposit in the amount of $20,000 became forfeitable on August 31, 1968. ↩
*. By Official Tax Court Order dated October 21, 1976, and signed by Judge Sterrett↩, the opinion was amended to read as indicated.
*. By Official Tax Court Order dated October 21, 1976, and signed by Judge Sterrett↩, the petitioner's motion for reconsideration was granted.