FREEPORT TRANSPORT, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ESTATE OF ALBERT CURCIO, DECEASED, FRANCES CURCIO, ADMINISTRATRIX AND SURVIVING WIFE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1922-73, 1795-73.    Filed November 12, 1974.

*Richard S. McIntyre,* for the petitioner in docket No. 1922-73.
*Ralph D. Conrad,* for the petitioner in docket No. 1795-73.
*David P. Smith,* for the respondent.

QUEALY, *Judge:* The respondent determined a deficiency in the Federal income tax of Freeport Transport, Inc., in the amount of $3,933.71 for the taxable year 1969. As a result of the agreement of the parties, the only issue remaining for decision in its case is whether it is entitled to deduct the sum of $20,000 paid to the seller as compensation in connection with the purchase of a certain trucking business.

The respondent also determined a deficiency in the Federal income tax of Albert Curcio, deceased, in the amount of $3,333.41 for the taxable year 1969.[1] The only issue for decision in this case is whether the Estate of Albert Curcio is entitled to treat the sum of $20,000 paid to Albert Curcio in the taxable year 1969 as part of the purchase price of a certain trucking business, taxable as a long-term capital gain within the meaning of sections 1201-1202.[2] Fully recognizing the inconsistency of his position, the respondent moved that the cases be consolidated for trial. That motion was granted without objection by the parties.[3]

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

The petitioner, Freeport Transport, Inc. (hereinafter referred to as Freeport), is a corporation engaged in the transportation business as a common carrier.

The Estate of Albert Curcio, deceased, Frances Curcio, administratrix, and Frances Curcio, surviving wife, resided in Newell, Pa., at the time the petition was filed in the United States Tax Court. Albert Curcio and Frances Curcio filed a joint Federal income tax return (Form 1040) for the taxable year 1969 with the district director of internal revenue, Pittsburgh, Pa.

Prior to 1968, Albert Curcio (hereinafter referred to as decedent) was an individual engaged in the business of transporting property, including sulphuric and nitric acid, under

---

[1] Frances Curcio, individually, is a petitioner by reason of having filed a joint return with Albert Curcio, deceased, her husband.

[2] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

[3] The attorney for Freeport objected to the motion insofar as it might require the filing of a consolidated brief and the right of the respective petitioners to file separate briefs was recognized at trial. Notwithstanding the Court's instructions to the contrary, the respondent also proceeded with the filing of a consolidated brief.

the authority of certain Certificates of Public Convenience issued by the Pennsylvania Public Utility Commission.

Prior to 1968, Freeport was engaged primarily in the transportation of dry chemicals and firebrick and was inexperienced in the hauling of such commodities as sulphuric and nitric acid. At all times material herein, Mr. Andrew Smetanick (hereinafter referred to as Smetanick) was president of Freeport.

On March 12, 1968, decedent and Freeport entered into certain agreements relating to the sale by decedent to Freeport of decedent's operating authority (i.e., certificates of public convenience). The operating authority encompassed the operation of a trucking service for transportation of, among other things, goods and merchandise for the General Chemical Division of Allied Chemical & Dye Corp. from the village of Newell to specified points in the State of Pennsylvania.

The first agreement stated that Freeport would purchase, and decedent would sell, decedent's operating authority and goodwill for $10,000 to be paid in a lump sum on a described settlement date. It further provided that, as "an inducement" to the sale, decedent would be employed for a period of 2 years by Freeport and would receive for his services a "salary" of $5,000 for the first year, to be paid at the settlement date, and of $20,000 for the second year, to be paid 1 year from the settlement date. Finally, decedent agreed not to compete with Freeport for a period of 5 years.

The agreement further recited that the services required to be performed by decedent included maintaining customer contacts and promoting good customer and community relations and other services designed to preserve to transferee the benefit of continued business from transferor's shippers and the accomplishment of an efficient operation by transferee and the territories served by transferor. The agreement also provided that in the event of the death of decedent any unpaid balance of the wages shall be payable to his estate and that the agreement would be null and void if the Pennsylvania Public Utility Commission denied approval of the transfer of the operating authority from decedent to Freeport.

A second agreement entered into by decedent and Freeport on the same date made reference to and supplemented the first agreement. This agreement provided that during a 1-year period

from the designated settlement date (July 5, 1968) Freeport would have the right to transfer the operating authority back to decedent, whereupon Freeport's liability would be limited to the initial payment of the $10,000 made to decedent for the operating authority and the employment for the first year of the agreement in the amount of $5,000. The agreement further provided that Freeport would deposit $20,000 in escrow with a bank at the time of settlement, to be paid to decedent on the condition that Freeport elected to keep the operating authority. If Freeport elected not to keep the operating authority, then the $20,000 would be returned to Freeport.

On July 5, 1968, Freeport had deposited with the Union National Bank of Pittsburgh, as escrow agent, the sum of $20,000 in accordance with the terms of the escrow. Freeport duly elected not to exercise its right to turn back the certificates and on April 22, 1969, the sum of $20,000 was paid to decedent.

Decedent had a heart attack in April of 1969 and was hospitalized from April 11, 1969, until May 3, 1969. He died on September 22, 1969, of a myocardial infarction (heart attack).

Prior to his death, and to the extent called upon by petitioner, decedent initially performed a variety of services for Freeport as provided for in the agreement of sale. Curcio advised Freeport concerning State and Federal regulations governing the transportation of sulphuric and nitric acid. Curcio also advised Freeport concerning what types of safety and hauling equipment to purchase in order to handle and haul the commodities covered by his certificates, which commodities included acids which Freeport had never before handled or hauled. He further assisted in the settlement for Freeport of grievances and claims made against Freeport involving such matters as acid spills and the like. Curcio also instructed Freeport's employees in the use of safety equipment and in the proper procedures and techniques for hauling and handling sulphuric and nitric acid.

Decedent was able to transfer to Freeport the acid hauling business of Allied Chemical & Dye Corp., the principal customer for its route. He also solicited and obtained a new customer for Freeport, namely, Bethlehem Steel in Johnstown, Pa.

In January 1969, a dispute took place between decedent and Smetanick, Freeport's principal officer, following which decedent's activities on behalf of Freeport were restricted. This was followed by the illness of decedent beginning in April 1969,

so that for all practical purposes, decedent performed little or no services for Freeport after January 1969.

In the negotiations leading up to and the execution of the agreements for the sale of the certificates by decedent to Freeport, both parties were represented by counsel, and there is no evidence of any mistake, undue influence, fraud, duress, or the like.

In its income tax return for the taxable year 1968, Freeport deducted the sum of $5,000 paid to decedent as compensation. In its income tax return for the taxable year 1969, Freeport deducted the sum of $20,000 paid to decedent as compensation. The respondent has determined that the sum of $20,000 deducted in the taxable year 1969 constituted a part of the purchase price of the business and, as such, should be capitalized.

In his income tax return for the taxable year 1968, decedent included the "salary" of $5,000 paid by Freeport as compensation. In his income tax return for the taxable year 1969, decedent treated the "salary" of $20,000 received from Freeport as gain from the sale of a capital asset (i.e., the trucking business), taxable under sections 1201-1202. The respondent has determined that the sum of $20,000 received in the taxable year 1969 constituted compensation for services and, as such, should be taxed as ordinary income.

The sum of $5,000 paid to decedent by Freeport on the settlement date of the agreement and $5,000 of the sum of $20,000 paid to decedent by Freeport on April 22, 1969, as compensation for decedent's services, were reasonable in amount and deductible as such. The balance of $15,000 is attributable to the purchase of the business.

OPINION

Freeport entered into agreement with the decedent, the then operator, for the purchase of certificates of public convenience for certain hauling or truck routes issued by the Pennsylvania Public Utility Commission, together with the goodwill attaching thereto. After some negotiations, the parties agreed upon a total consideration of $35,000.

Consummation of the transfer of the business to Freeport was, however, dependent upon approval of the Pennsylvania Public Utility Commission, the acceptance of Freeport as operator by decedent's principal customer or customers, and the capability of

Freeport successfully to meet the needs of those customers. Freeport was not willing unqualifiedly to accept these risks.

The agreements negotiated by the parties thus provided for an initial payment of $10,000 for the transfer of the certificates, $5,000 as "salary" for services to be rendered by decedent during the first year of operation in order to enable Freeport successfully to take over the business, with the deposit of an additional $20,000 in escrow to be paid to decedent as "salary" on the first anniversary of the sale if Freeport elected to retain the certificates. If not, Freeport could elect to rescind the sale and forfeit the sum of $15,000 previously paid to decedent.

In the case of *Freeport Transport, Inc.,* the respondent has determined that the sum of $5,000 was adequate compensation for any services performed by decedent during the first year of the contract and up until his illness in April 1969 and that the balance of $20,000 should be treated as an additional amount paid on account of the purchase of the business. In support thereof, respondent points out that decedent did not, in fact, perform any services after he became ill in April 1969. Contrary to this position, the respondent has further determined in the case of the *Estate of Albert Curcio* that the sum of $20,000 received on account of the transaction with Freeport is taxable as ordinary income.

An appeal from the decision in this case would lie in the U.S. Court of Appeals for the Third Circuit. Insofar as applicable, we are thus constrained by our decision in the *Golsen* case [4] to apply the principles enunciated by that court in *Commissioner v. Danielson,* 378 F. 2d 771 (C.A. 3, 1967), vacating and remanding 44 T.C. 549 (1965), certiorari denied 389 U.S. 858 (1967). Although the agreements in question characterized both the payment of $5,000 and the payment of $20,000 as "salary," respondent is not bound thereby. *Commissioner v. Danielson, supra;* see also *Schulz v. Commissioner,* 294 F. 2d 52 (C.A. 9, 1961).

In the case of *Freeport Transport, Inc.,* the respondent has determined that the sum of $20,000 characterized as "salary" in the agreement was in substance a part of the purchase price of the business. The burden thereupon rested on Freeport to present evidence to show that the sum of $20,000 in dispute was, in fact,

---

[4] *Jack E. Golsen,* 54 T.C. 742 (1970), affd. 445 F. 2d 985 (C.A. 10, 1971).

compensation for services to be performed by the decedent, not an additional payment on account of the purchase price of the business, characterized as compensation in order that Freeport might obtain the benefit of a tax deduction.

Freeport adduced testimony to prove that the value of the business (i.e., the certificates and goodwill) was not more than $10,000 and to establish that decedent was, in fact, obligated to perform services essential to the acquisition of that business by Freeport, on account of which, if successful, Freeport was willing to pay an additional $25,000.

The Court cannot accept Freeport's proof with respect to the value of the business for the simple reason that Freeport, in substance, agreed to pay more. Freeport's principal officer admitted that whatever amount Freeport was required to pay to decedent, whether for services or otherwise, was clearly a part of its out-of-pocket cost of acquiring the business.

In a colloquy with respect to the escrow funds, Smetanick testified as follows:

THE COURT: Now, whether you paid it to him as compensation or whether you paid it to him as purchase price, I don't know that it makes any difference. As your testimony here today presents the matter, you had to pay out this much money in order to successfully take over this business. Part of it, you say, is purchase price; part of it is compensation to the seller to stick around and show you how to do it and keep the good will; is that right?

THE WITNESS: Well, Freeport Transport, if it had the operating authority itself, would not have engaged—and Allied Chemical would have refused to tender any of its traffic to us, because none of our people were qualified to—

THE COURT: That might be, but you tell me in one breath that it's only worth $10,000.00, and then the record in this case shows that you were willing to pay a lot more than $10,000 in order to get this business. Now, that's what the record shows. The record speaks for itself, isn't that right?

THE WITNESS: Well, as an offshoot of the services and the training and the experience that we got—

THE COURT: But that was an essential part of getting the business, wasn't it?

THE WITNESS: Yes, sir, the training.

THE COURT: Based on your testimony—

THE WITNESS: Yes, sir.

THE COURT: —that you couldn't handle the business unless he did this.

THE WITNESS: Yes, sir.

THE COURT: So you were paying the $30,000.00 to get the business then.

THE WITNESS: Well, the knowledge and the business, yes.

Furthermore, if we look to the transaction in its totality, we can attach little probative value to the agreement itself.

Decedent wanted $35,000 for the business. Freeport wanted to be certain that it got what it bargained for, and was equally interested in getting the best deal that it could. The allocation of $25,000 for the type of services the decedent might be called upon to perform in furtherance of a business grossing $35,000 per year is wholly disproportionate. The allocation thus lacks the "substance" to which the Third Circuit referred in the *Danielson* case.

Regardless of the terms upon which the payments were scheduled, it is also clear that whatever amount of the initial payment of $5,000 and of the sum of $20,000 was to be paid to decedent for his services, such amount was intended for such services "as a whole" and not on any month-by-month or year-by-year basis. Hence, on the first anniversary date of the agreement, decedent was to receive the additional sum of $20,000 regardless whether he performed any services thereafter. Payment of the full amount, irrespective whether decedent was required to perform any services for the second year, does not mean that no part of the $20,000 payment was intended for services.

The difficulty facing the Court is that neither Freeport nor the respondent presented evidence with respect to the actual extent and value of the decedent's services, leaving to the Court the problem of determining how much of the payment of $20,000 should be attributed to the business, namely, the certificates and goodwill (including the covenant not to compete) [5] and how much should be attributed to the services contracted for by petitioner including services admittedly performed by him for which Freeport would otherwise have had to hire someone else.

The obligation undertaken by decedent and the services actually performed by him up until the time of his illness, were certainly worth the initial payment of $5,000, if not more. Since decedent's obligation could extend for the second year of the contract, and we must look to what was contracted for, rather than what Freeport actually required of decedent, the Court has no difficulty in placing a total value of $10,000 on such services, leaving the balance of $15,000 as an additional cost of the business.

---

[5] No evidence was presented to establish any separate value for the covenant not to compete, presumably because of the exclusivity of the certificates themselves.

Having determined the amount allocable to the purchase of the business and the amount allocable to the services of the decedent in the case of *Freeport Transport, Inc.,* such determination would normally be regarded as controlling in the case of the *Estate of Albert Curcio.* See, e.g., *Schulz v. Commissioner, supra; J. Leonard Schmitz,* 51 T.C. 306 (1968), affirmed sub nom. *Throndson v. Commissioner,* 457 F. 2d 1022 (C.A. 9, 1972). The only remaining question is whether the estate is precluded from taking advantage of that determination on account of the special rule promulgated by the Third Circuit in *Commissioner v. Danielson, supra.*

In the *Danielson* case, the taxpayer sought to prove that an amount allocated in a contract for the sale of a business to the seller's covenant not to compete had no independent basis in fact. Thus, having agreed to the allocation of a specific amount for the covenant not to compete in the contract of sale, the taxpayer nevertheless sought to prove that the covenant had no value and that the full amount received should be deemed a part of the purchase price. The rule succinctly stated by the Third Circuit in such cases was to the effect that in a proceeding in this Court between a taxpayer, party to the contract, and the respondent, the taxpayer is bound by the terms of the contract in the absence of a showing of mistake, undue influence, fraud, duress, or the like.

The estate contended that if the two agreements between the parties are taken together, there is an ambiguity on account of which the estate may present parol evidence with respect to the real intent of the parties, or at least the intent of the decedent. The estate thus sought to show that the sum of $20,000 which was paid to the decedent, ostensibly as "salary" or compensation for services contracted for, was in substance payment of part of the purchase price for the business.

The Court does not find the requisite ambiguity in the agreements. However, we do not regard the failure of the estate to establish mistake, undue influence, fraud, duress, or the like, as determinative of the issue. To do so would produce a wholly incompatible result in two related cases, consolidated on motion by the respondent, for the sole purpose of protecting the revenues.

In the *Danielson* case, both of the parties to the agreement were not before the Court. The taxpayer in that case affirmatively sought to show that the agreement entered into by him was lacking in substance. The respondent argued successfully that

the taxpayer was precluded from varying the terms of that agreement. Here both parties to the agreements are before the Court. The respondent does not object to the presentation of evidence varying the terms of these agreements. On the contrary, the respondent participated in the presentation of proof tending to show that the agreements did not truly represent the facts of the transaction. When faced with these circumstances, the Court finds no basis for invoking the so-called *Danielson* rule. Accordingly, in the case of the estate, we find that $5,000 of the total of $20,000 paid in 1969 represented compensation for the services of the decedent, and the balance of $15,000 represented a part of the purchase price for the business.

In accordance with the above,

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

GOFFE, *J.,* dissents.

DAWSON, *J.,* concurring: As the author of this Court's *Danielson* opinion, I agree with the approach taken and the result reached in the majority opinion written by Judge Quealy here. I think the Court of Appeals for the Third Circuit, in its wisdom, would not invoke its so-called *Danielson* rule in these particular circumstances where both parties to the agreements are before the Court. The practical, and I believe correct, solution is to let the substance of the transaction prevail over the form of the agreements. That is exactly what the majority opinion does.

In addition, I have the following comments. Respondent took inconsistent and alternative positions in the notices of deficiencies sent to the respective petitioners so that the revenue would be adequately protected. It is understandable that he did not want to be whipsawed by the respective petitioners since they are in opposite positions for Federal income tax purposes. Respondent is simply seeking consistent tax treatment in accordance with the facts and circumstances surrounding the transaction. Neither the consolidation of the two cases nor respondent's request for consistent tax treatment of the respective petitioners has any effect on burden of proof. In each case I think the burden of proof remains on the respective petitioners to show to the satisfaction of the Court that the respondent's determination is erroneous. Clearly the inconsistent

positions taken by the respondent were not without a rational factual or legal basis. See *Leon R. Meyer,* 46 T.C. 65, 82-83 (1966), affirmed on this issue 383 F. 2d 883 (C.A. 8, 1967); *Estate of Goodall v. Commissioner,* 391 F. 2d 775, 781-784 (C.A. 8, 1968), certiorari denied 393 U.S. 829 (1968); *Brantley L. Watkins,* 53 T.C. 349, 358-359 (1969); *M. Lucille Harrison,* 59 T.C. 578, 592 fn. 13 (1973); *J. Leonard Schmitz,* 51 T.C. 306, 313 (1968). In his well-reasoned opinion in the *Goodall* case Judge (now Justice) Blackmun said (391 F. 2d at 782-783):

> 4. These are, after all, tax cases. Substantial sums are involved. The Commissioner is charged with the protection of the revenues. While these factors might be viewed as pragmatic, it would be unseemly, we feel, to force the Commissioner, in the performance of his administrative duties, to make an awesome choice of this kind at his peril. Taxes are not a game. Of course, the Commissioner, and the government itself, in this court is no more and no less than just another litigant. But we are aware of every person's tax responsibilities and we are not inclined to let the realization of revenues stand or fall on so technical a base as impeccable consistency. Consistency is desirable but its virtue has limits. Good faith inconsistency buttressed by acceptable argument, when considered in the framework of the Commissioner's responsibilities, cannot be regarded as an offense which provides a bar to bona fide tax litigation.

> 5. Inconsistency in determinations, when they are not made in bad faith, does not equate with an absence of the statutorily required determination, as the taxpayers suggest. Each taxpayer, even though there are several related ones, by the determination and notice made for him, knows the position the Commissioner is taking with respect to his tax situation. So long as the ultimate resolution of the issues is consistent for all, we see no legal wrong.

FORRESTER, FAY, SIMPSON, FEATHERSTON, IRWIN, and STERRETT, *JJ.,* agree with this concurring opinion.

TANNENWALD, *J.,* concurring: I agree with the result reached by the majority, but I would not want to leave the impression that the nonapplicability of the *Danielson* rule should be limited to consolidated cases. We have already indicated our dissatisfaction with such a narrow approach (see *J. Leonard Schmitz,* 51 T.C. 306, 318 (1968), affirmed sub nom. *Throndson v. Commissioner,* 457 F.2d 1022 (C.A. 9, 1972)), and I do not believe the Third Circuit should or would confine any exception to *Danielson* to the consolidated case situation. The fact of the matter is that, in *Danielson,* the respondent had clearly indicated that he would apply the Court's decision to both parties to the

transaction, whichever way it went and even though only one party was actually before the Court. See 378 F.2d at 773 fn. 3.

To me, the application of *Danielson* turns upon whether or not the respondent seeks to invoke the rule of that case in the Third Circuit as to both parties. If he does, the rule applies. If he does not, the rule is inapplicable. Here, respondent adopted the latter alternative.

FEATHERSTON, *J.,* agrees with this concurring opinion.