JACQUES B. WALLACH AND DORIS F. WALLACH, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Wallach v. Commissioner
Docket Nos. 871-79, 3795-79, 15338-80, 19525-80.
United States Tax Court
T.C. Memo 1982-502; 1982 Tax Ct. Memo LEXIS 246; 44 T.C.M. (CCH) 1002; T.C.M. (RIA) 82502; August 31, 1982. Waldron Kraemer and Douglas E. Burns, for the petitioners in docket Nos. 871-79 and 15338-80. Leonard M. Goldberg and Ronald A. Sinaikin, for the petitioner in docket Nos. *247 3795-79 and 19525-80. William F. Halley, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in the Federal income tax of petitioners Dr. and Mrs. Jacques B. Wallach as follows: Year
Deficiency
1973
$27,144.76
1974
13,329.36
1975
21,796.02
1976
15,990.78
The Commissioner determined deficiencies in the Federal income tax of petitioner Alden Bioclinical Laboratories, Inc., as well as additions to tax under section 6651(a), [2] as follows: Year
Deficiency
Addition to Tax
1973
$27,269.62
$6,817.41
1974
30,666.14
7,666.54
1975
19,852.96
4,963.24
1976
11,401.24
2,850.31
After concessions by the parties, the only issues remaining for decision are: (1) the proper allocation between stock and a covenant not to compete of the price paid to acquire an incorporated clinical pathology business; (2) the proper allocation of the purchaser's basis in the stock to assets received on *248 liquidation of the corporation; and (3) whether the petitioner Alden Bioclinical Laboratories, Inc., is liable for additions to tax for its failure to file its corporate income tax returns on time. FINDINGS OF FACT Some of the facts in these cases have been stipulated. The stipulations of fact and stipulated exhibits are incorporated herein by this reference. The petitioners Dr. and Mrs. Jacques B. Wallach filed timely joint Federal income tax returns for their taxable years in question. At the time their petitions in these cases were filed they resided in New Jersey. The petitioner Alden Bioclinical Laboratories, Inc., is a corporation organized and existing under the laws of New Jersey. As discussed below, it filed delinquent Federal income tax returns for its taxable years in question. At the time its petitions in these cases were filed, its principal office was located in New Brunswick, New Jersey. We will present issues (1) and (2) together, because they arose out of the same general facts. Issue 1. Sale of Wallach Lab and Issue 2. Liquidation of Wallach Lab
The petitioners in these consolidated cases are the seller and purchaser of a clinical laboratory *249 business. The petitioner Jacques B. Wallach is a doctor of medicine. He received hiw M.D. degree in 1947 at the State University of New York and thereafter received further training in medicine and cytology at various hospitals in New York City. He then taught at various medical schools in New York City until 1959, when he left to take a position at a hospital in Elizabeth, New Jersey. Dr. Wallach left this position in 1960 to enter the private practice of laboratory medicine. His first laboratory was in Cranford, New Jersey, but from 1961 until the sale of the business described below, his laboratory was located in Westfield, New Jersey. His practice was incorporated on February 14, 1969, under the laws of New Jersey. The corporate name was The Laboratory of Dr. Wallach, Inc. (hereinafter referred to as Wallach Lab). One hundred shares were issued to Dr. Wallach, representing all of Wallach Lab's issued and outstanding shares. Dr. Wallach described his practice as: essentially divided into two areas: one area of anatomic pathology consisted of examining specimens under the microscope. These were principally pap smears in screening for cancer of the uterus and biopsies *250 from various sites, usually to distinguish cancer from non-malignant lesions, occasionally performing autopsies. The other part of the practice was what's called clinical pathology and refers to doing laboratory tests on various body fluids, such as blood chemistries, blood counts, urinalyses and so forth. In order to practice anatomic pathology, a person is required to be a licensed physician. Clinical pathology, on the other hand, may be practiced by a layman. Wallach Lab's clinical pathology business came from two sources, "pickup" business and "walk-in" business. The "pickup" business consisted of picking up specimens taken by physicians in their own offices and taking them to Wallach Lab's facilities, where the tests were performed. In this case, the decision to use the services of Wallach Lab was made by the referring physician. The "walk-in" business consisted of the performance of tests which had been prescribed by the patient's physician, but for which the physician had not specified a particular laboratory. In the case of the "walk-in" business, Wallach Lab's services were chosen by the patient himself. About half of Wallach Lab's clinical pathology business came *251 from each source. The "walk-in" business was more profitable than the "pickup" business; charges were typically about three times as high for the former as for the latter. Wallach Lab served Westifield and the surrounding communities. One other clinical laboratory was located in the Westfield area but it was very small and not very active, and thus was not a competitive factor. Apart from that, the only other laboratories which the residents of Westfield could have used were in hospitals in "somewhat more distant communities." Dr. Wallach did not advertise the services of Wallach Lab extensively. He placed an announcement in a local newspaper when the laboratory was opened and made some telephone calls to local doctors advising them of the availability of its clinical testing services, but no greater efforts to secure business were necessary because "there was basically no other laboratory for them to go to in that town." During the years from the mid-1960's to the early 1970's, the clinical laboratory business became increasingly automated, with a resulting increase in efficiency. As Dr. Wallach stated, The trends were that the increasing automation, particularly in *252 blood chemistry, meant that more chemistries could be done at a much lower price, and that the whole price structure was markedly being changed as a result of this. And so tests that would formerly have resulted in a cost of five dollars or an income of five dollars were now being batched at a cost of perhaps 12 tests for $15. This trend toward automation posed a problem for small laboratories such as Dr. Wallach's. They were forced to compete with automated laboratories which could offer the same services at a lower price, and the cost of purchasing the new equipment was often prohibitively high. This trend led Dr. Wallach in 1972 to contract Dr. Stanley Levy, the president and majority shareholder [3] of the petitioner Alden Bioclinical Laboratories, Inc., (hereinafter referred to as Alden Lab). Alden Lab had been incorporated on or about January 3, 1968, under the laws of New Jersey, and was also engaged in the clinical laboratory business. Alden Lab was more automated than Wallach Lab, [4] and Dr. Wallach was interested in pooling the resources of the two laboratories as a means of competing with other automated laboratories. Dr. Levy agreed to this arrangement, but the *253 relationship soon became one-sided. As Dr. Wallach explained, As it turned out, the gist of it was that he ended up doing all of these particular chemistry tests for me. But since he already had the other equipment that I had, there was really no work I could do for him in exchange. Therefore I ended up paying him money for doing those tests. After the two laboratories had been engaged in this relationship for some months, Dr. Wallach approached Dr. Levy with the suggestion that Alden Lab buy Wallach Lab. In addition to the difficulty of competing with more automated laboratories, there were a number of other reasons that Dr. Wallach was interested in selling his laboratory at that time. The principal one was his desire to spend more time with his family. He also wanted to revise a textbook on cytology he had written and do more teaching at medical schools. He also wanted to travel. Finally, he wanted to ensure the financial security of his family against the possibility of his death, and he believed that the liquidity which would result from the sale *254 of the business would help him achieve that goal. Because of all these factors, Dr. Wallach had no intention of practicing clinical pathology following the sale of Wallach Lab. The negotiations for the sale of Wallach Lab lasted several months, and different persons were involved at different stages. Initially, the bargaining was conducted solely between Dr. Wallach and Dr. Levy. They agreed that the sale would involve only the clinical pathology portion of Wallach Lab's business. Dr. Wallach wanted to retain his anatomic pathology practice, and Dr. Levy was not interested in purchasing that portion of the business. In their preliminary negotiations, Dr. Wallach and Dr. Levy reached a working agreement that the price of the clinical pathology business would be $330,000. This figure was first suggested by Dr. Wallach and was arrived at by multiplying the gross receipts of Wallach Lab's clinical pathology business for the previous year by two and one-half. [5] The $330,000 figure, which remained the sales price in the final agreement, was mentioned before any discussion of including a covenant not to compete as part of the agreement. It was, however, understood by the parties *255 that, after the sale was completed, Dr. Wallach would not continue to practice clinical pathology. Dr. Levy was aware that, for the reasons mentioned above, Dr. Wallach did not wish to remain in that business. After Dr. Wallach and Dr. Levy had completed their preliminary negotiations, their advisors were called in. Dr. Wallach's attorney prepared a draft of the sales contract, the pertinent parts of which provided as follows: PROPOSAL FOR THE SALE OF ALL THE ISSUED AND OUTSTANDING STOCK OF THE LABORATORY OF DR. WALLACH, INC., FROM JACQUES B. WALLACH TO STANLEY LEVY.
1. Basic Purchase Price: $330,000.00 9. Restrictive Covenants:
For a period of five (5) years subsequent to closing Wallach shall not directly or indirectly own or work for a clinical laboratory located in Union or Middlesex Counties. Wallach's employment in a laboratory owned by a pharmaceutical or diagnostic manufacturer, hospital, medical school or industial firm located in Union *256 or Middlesex Counties shall not be precluded so long as that laboratory does not engage in the regular solicitation of clinical laboratory work from private physicians in competition with either the Alden or the Wallach laboratories. The restrictive covenant shall in no way be construed to in any way inhibit Dr. Wallach from engaging in the practice of cytology and tissue diagnosis at any location. 11. Use of Wallach's Name:
(a) For a period of two years after the closing the corporation may continue to use the name "The Laboratory of Dr. Wallach, Inc."; (b) After the two years the corporation shall change its name to eliminate the word "Wallach". However, for an additional three years, the corporation may, on its letterhead, and on its door next to its new name state that it was formerly "The Laboratory of Dr. Wallach, Inc." The restrictive covenant was included at the request of Dr. Levy's attorney, who had discussed the deal with Dr. Wallach's attorney before the draft agreement was prepared. Following the preparation of the preliminary draft, negotiations continued. A number of points were raised by Dr. Levy and its advisors, including the schedule for the payment *257 of the purchase price, the security they would provide for the payment, the termination of the pension and profit sharing plan which Wallach Lab had maintained, and the matter of which corporate assets would be distributed out to Dr. Wallach prior to the sale and which ones would be retained by the corporation. Dr. Levy also insisted that Dr. Wallach obtain an extension of Wallach Lab's lease prior to the sale. Agreement was reached on all of these points. Dr. Levy also requested that the area referred to in the restrictive covenant be stated in terms of a thirty-mile radius from the location of Wallach Lab's premises, rather than by naming the counties in which Dr. Wallach would not practice clinical pathology. This request was granted without hesitation. Because Dr. Wallach had no desire to remain in the clinical pathology business in any event, the restrictive covenant was of no concern to him. He would have asked the same price for the stock of Wallach Lab whether he had given the covenant or not. The threat of competition was, however, significant to Dr. Levy, since he did not believe that the Westfield area could support more than one clinical laboratory. Robert Grodnick, *258 Dr. Levy's accountant and tax advisor, met with Dr. Wallach's attorney during the negotiations and informed him that--"we would not buy any stock of Dr. Wallach's. It would be strictly a covenant not to compete, because that's the only way we could take advantage of the tax writeoff." The final draft of the agreement, however, was structured as a sale of stock, just as the preliminary draft had been, with related covenants. The pertinent parts of the final draft of the sales contract provided as follows: THIS AGREEMENT, made this 1st day of June, 1973, BY AND BETWEEN: JACQUES B. WALLACH, residing at 18 Dartmouth Road, Cranford, New Jersey 07016, (hereafter Wallach); ALDEN BIOCLINICAL LABORATORIES, INC., a New Jersey corporation, 187 Livingston Avenue, New Brunswick, New Jersey, (hereafter Alden); and STANLEY LEVY and DIANE LEVY, his wife, residing at 52 Independence Road, East Brunswick, New Jersey (hereafter jointly referred to as Levy); The parties mutually agree, as follows: 1. Sale of Shares:
Subject to the terms and conditions hereof, Wallach agrees to sell and Alden agrees to purchase at the closing, all the issued and outstanding shares of Laboratory *259 for a total consideration of Three Hundred Thirty Thousand ($330,000.00) DOLLARS. 9. Post-Closing Covenant Imposed Upon Wallach:
For a period of five (5) years subsequent to Closing, Wallach shall not directly or indirectly own or work for a clinical laboratory located in New Jersey within thirty miles of Laboratory's present location. Wallach's employment in a laboratory owned by a pharmaceutical or diagnostic manufacturer, hospital, medical school or industrial firm located within the prescribed area shall not be precluded so long as that laboratory does not engage in the regular solicitation of clinical laboratory work from private physicians in competition with either Alden or Laboratory. The restrictive covenant shall in no way be construed to in anyway inhibit Dr. Wallach from engaging in the practice of cytology and tissue diagnosis and performing radio immune assays, at any location. 14. Use of Wallach's Name:
(a) For a period of two (2) years after the Closing Laboratory or Alden may continue to use the name "The Laboratory of Dr. Wallach, Inc.". (b) After the two year period Laboratory shall change its * * * [name] to eliminate the word "Wallach". *260 However, for an additional three (3) years, Laboratory may, on its letterhead, and on its door next to its new name state that it was formerly "The Laboratory of Dr. Wallach, Inc.". Prior to execution, the agreement was reviewed by Mr. Grodnick, who expressed some misgivings about its language; he felt that it provided for a sale of stock, with no allocation of any part of the purchase price to the covenant not to compete. Mr. Grodnick had emphasized to Dr. Levy the tax advantages to him of structuring the transaction with as much of the purchase price as possible allocated to the restrictive covenant. These misgivings, however, were apparently resolved by Mr. Grodnick by the time the agreement was executed on June 1, 1973. He had concluded, by then, that the agreement provided a basis for allocating almost all of the purchase price to the restrictive covenant, and he later prepared Alden Lab's income tax returns on that theory. Dr. Levy, his attorney, and Mr. Grodnick discussed the tax implications of the covenant not to compete at considerable length among themselves. Except for the meeting between Mr. Grodnick and Dr. Wallach's attorney mentioned above, however, there was *261 apparently no communication between the different sides as to the portion of the total sales price to be allocated to the covenant, and the parties harbored differing views on the matter both at the time are agreement was executed and thereafter. Mr. Grodnick believed that "it was definitely a covenant not to compete that we purchased." Dr. Levy believed that "I spent the money on a covenant not to compete. That's what * * * I definitely felt I was buying * * *. That's the term that was thrown at me since the whole deal started, from my accountant, that I was buying that." On the other hand, Dr. Wallach's attorney understood that the deal was "a rather conventional stock purchase transaction. Quite frankly a lot of the language of the purchase agreement comes out of what at that time was to a certain degree my office's boiler plate form for stock purchase agreements, with some modifications * * * tailoring it to the deal * * * a rather humdrum stock purchase agreement." Dr. Wallach understood that the purchase price was allocable "completely" to the stock of Wallach Lab. These conflicting interpretations were reflected in the tax returns of Dr. Wallach and of Alden Lab. Dr. *262 Wallach reported the transaction as a sale of stock for $330,000, resulting in a capital gain. He reported the sale on the installment method, [6] spreading part of the gain over each of his taxable years in question. Alden Lab, on the other hand, reported the transaction as a purchase of stock for $14,500, which was the value of the tangible assets remaining in Wallach Lab at the time of the sale, and the purchase of a covenant not to compete for $315,500. Alden Lab then amortized the covenant over its five-year life. Immediately after acquiring Wallach Lab, Alden Lab liquidated the corporation in a transaction conceded by respondent to qualify as a complete liquidation under section 332(b). Pursuant to section 334(b)(2), Alden Lab treated the tangible assets received on liquidation as acquiring a basis of $14,500, the basis it claimed to have had in the stock with respect to which the distribution was made. No basis was assigned to any intangible assets received on liquidation. Depreciation deductions were then taken for the tangible assets. [7]
*263 The Commissioner issued notices of deficiency to Dr. Wallach and to Alden Lab. In the notices of deficiency issued to Dr. Wallach, the Commissioner determined that $315,500 of the total purchase price was allocable to the covenant not to compete, and that, to that extent, Dr. Wallach's gain on the sale gave rise to ordinary income, rather than capital gain. In the notices of deficiency issued to Alden Lab, the Commissioner determined that no deductions were allowable for the years in question for amortization of the covenant not to compete, because "the covenant not to compete included in your contract to purchase the stock of Laboratory of Dr. Wallach, Inc. from Jacques B. Wallach was not assigned a value and the value, if any, is inseparable from the total purchase price." By contradicting each of the inconsistent positions of the parties, the Commissioner has, of course, himself taken inconsistent positions. The Commissioner acknowledges this and states that he does not desire to prevail over both petitioners but merely to assure that their treatment of the transaction is consistent. Issue 3. Additions to Tax
Alden Lab's Federal corporate income tax returns for *264 all of its taxable years in question were filed late. The corporation's taxable year was the calendar year. Its return for 1974 was received by the Internal Revenue Service on October 8, 1976, and its returns for 1975 and 1976 were both received on January 5, 1979. As noted above, Alden Lab's accountant and tax advisor was Mr. Robert Grodnick. Mr. Grodnick was an experienced accountant, and Dr. Levy left the corporation's bookkeeping and tax returns up to him. All of the information necessary to prepare its tax returns on time was available to him on request. Mr. Grodnick generally assured Dr. Levy on several occasions that the corporation's returns were being taken care of in a proper fashion, although he never specifically represented that the returns had been filed when, in fact, they had not been. Dr. Levy found out that the returns had been filed late only when the Commissioner began to inquire into the matter. OPINION Issue 1. Sale of Wallach Lab and
Issue 2.Liquidation of Wallach Lab
The first question that we must decide involves the proper allocation of the purchase price in the transaction described above between the stock of Wallach Lab and the *265 covenant not to compete. Amounts paid for a covenant not to compete are ordinary income to the covenantor and may be amortized over the life of the covenant by the purchaser. Hamlin's Trust v. Commissioner,209 F.2d 761 (10th Cir. 1954); Baldarelli v. Commissioner,61 T.C. 44 (1973); Schmitz v. Commissioner,51 T.C. 306 (1968), affd. sub nom. Throndson v. Commissioner,457 F.2d 1022 (9th Cir. 1972). By contrast, gain realized on the sale of stock is generally taxable to the seller at favorable capital gain rates, while the purchaser may not amortize the cost of the stock acquired. It is, therefore, in Alden Lab's interest in the present cases to allocate the price it paid to the covenant not to compete, while an allocation to the Wallach Lab stock favors Dr. Wallach. A party to a sale asserting that the correct allocation of the sales price is other than the one provided for in a contract negotiated at arm's length may be *266 subject to different standards of proof in different jurisdictions. This Court prefers the rule that the party challenging the allocation contained in the contract may succeed only by producing "strong proof" that the asserted allocation better reflects the actual intent of the parties and the economic realities of the situation. Major v. Commissioner,76 T.C. 239, 247 (1981); Ullman v. Commissioner,264 F.2d 305, 308 (2d Cir. 1959), affg. 29 T.C. 129 (1957). The Third Circuit, however, to which an appeal in the present cases would lie, has formulated the even stricter "Danielson rule," under which, a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter the construction, or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. [Commissioner v. Danielson,378 F.2d 771, 775 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), *267 cert. denied 389 U.S. 858 (1967).] In accordance with our opinion in Golsen v. Commissioner,54 T.C. 742, 756-758 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), we apply the Danielson rule in appropriate cases in the Third Circuit, but continue to adhere to the "strong proof" rule in circuits which do not follow the Danielson rule. Baldarelli v. Commissioner,supra at 49. Respondent argues that the Danielson rule should be applied to Alden Lab in the present cases. Respondent fails, however, to address himself to our holding on the scope of the Danielson rule in Freeport Transport, Inc. v. Commissioner,63 T.C. 107 (1974). In Freeport the cases of the buyer and the estate of the seller of a truck route were consolidated. The character of a payment of $20,000 made to the seller was at issue. The buyer argued that it had made the payment to compensate the seller for services which he had agreed to perform in connection with the transfer of the route, and this characterization was consistent with the sales agreements. The seller's *268 estate argued, however, that, the agreements notwithstanding, the payment was actually part of the purchase price of the route. The Commissioner protected the revenue by taking inconsistent positions, just as he has done in the present cases, in effect determining with respect to each party that that party was wrong and the other party was right. Because Freeport was appealable to the Third Circuit, we considered the applicability of the Danielson rule. We held that it did not apply in circumstances, like those present in Freeport, in which both parties to the agreement were before the Court, and the respondent did not object to the presentation of evidence varying the terms of the agreement. Freeport,supra at 116. The present cases present a like situation, [8] and we believe that the Danielson rule is likewise inapplicable to them. Accordingly, we will require only "strong proof" in the present cases to show that the intended allocation of the purchase price was other than the one provided for in the contract. [9] See Major,supra;Levinson v. Commissioner,45 T.C. 380 (1966); and Schulz v. Commissioner,34 T.C. 235 (1960), *269 in each of which the "strong proof" standard was applied in the consolidated cases of the different parties to an agreement. *270 Even under this less strict standard of proof, however, we believe that Alden Lab has failed to prove that any value should be assigned to the covenant not to compete. In the contract negotiated by the parties to the sale in the present cases, none of the total price was allocated to the covenant not to compete.Instead, the entire purchase price was stated as consideration for the stock of Wallach Lab. The only evidence produced by Alden Lab that the parties intended an allocation to the restrictive covenant consisted of the testimony to that effect of Dr. Levy and his accountant. This evidence is contradicted by the testimony of Dr. Wallach and his attorney that no such allocation was intended. We do not find the testimony on either side more credible than that on the other side. Consequently, we conclude that Alden Lab failed to produce "strong proof" that the parties intended an allocation of the purchase price to the covenant not to compete which was not recorded in their contract. Therefore, we take the contract as we find it and hold that the entire purchase price of $330,000 is allocable to the Wallach Lab stock. See Major v. Commissioner,supra at 250, *271 in which the Court considered the allocation issue in a factual situation similar to the present one. There, a petitioner corporation had argued that $400,000 of the $800,000 it had paid to acquire the stock of another corporation was allocable to a covenant not to compete, although no such allocation was mentioned in the sales contract. The Court stated: We find it hard to believe that it intended such a significant allocation at the time the contract was entered into, yet did not express it despite the fact that there had been two preliminary drafts of the contract. Except that there was only one preliminary draft in the present cases, the same could be said of Alden Lab. Alden Lab cites Wilson Athletic Goods Mfg. Co., Inc. v. Commissioner,222 F.2d 355 (7th Cir. 1955), revg. a Memorandum Opinion of this Court. In that case, in which the petitioner was the buyer of a shoe manufacturing company, the sales contract contained covenants not to compete. Although no part of the total purchase price was expressly segregated as the value of the covenants, the buyer nevertheless claimed deductions based on their alleged value. These deductions were denied by the *272 Commissioner. The Commissioner's action was upheld by the Tax Court, which found that "the covenants not to compete were not items which were severable from the entire transaction." In reversing the Tax Court, the Court of Appeals for the Seventh Circuit found that it was "not bound by the strict terms of the agreement," but rather was required to "ascertain the true intent, insofar as tax consequences are concerned." Considering the substance rather than the form of the agreement, the court concluded that the covenants not to compete had a discernible value in the amount alleged by the buyer and allowed the claimed deductions. Alden Lab now argues that, like the court in Wilson, we should look to the substance of the transaction and reach a similar result in the present cases. We have held, however, that the Seventh Circuit's "substance over form" approach is not inconsistent with our own rule requiring "strong proof" to support a contention that the substance of a transaction was different from the form in which it was cast in the sales contract. Major v. Commissioner,supra at 249. Alden Lab's failure to produce such strong proof would, therefore, *273 lead to the same result we have here reached even if this case were appealable to the Seventh Circuit and we were bound to follow Wilson.
The second question that we must decide involves the allocation of Alden Lab's basis in the stock of Wallach Lab to the assets it received on liquidation of Wallach Lab. We have decided above that the amount of Alden Lab's basis in the stock of Wallach Lab was $330,000. The parties agree that, immediately after its acquisition by Alden Lab, Wallach Lab was liquidated in a transaction which qualified as a complete liquidation within the meaning of section 332(b) and to which the basis rules of section 334(b)(2) were applicable. Therefore, Alden Lab's basis of $330,000 in the stock was required to be allocated among the assets received on liquidation in proportion to their net fair market values. Sec. 1.334-1(c)(4)(viii), Income Tax Regs. We agree with respondent that a basis of $14,500 must be allocated to the tangible assets received, because that was their net fair market value, and that the remainder, the excess of the purchase price over the value of the tangible assets, must be allocated to goodwill and other intangibles. See *274 R.M. Smith, Inc. v. Commissioner,591 F.2d 248 (3d Cir. 1979), affg. a Memorandum Opinion of this Court, and 69 T.C. 317 (1977) (supplemental opinion on Rule 155 computations), cert. denied, 444 U.S. 828 (1979), in which the value of intangible assets received on liquidation was determined by the "residual value" method which respondent has employed here. Alden Lab argues that no amount can reasonably be assigned to goodwill on the facts of the present cases, since the "walk-in" business involved few regular customers and, therefore, the definition of goodwill as "the probability that the old customers will resort to the old place" [10] is inapplicable. The "walk-in" business, however, was only about half of Wallach Lab's total clinical pathology business. The "pickup" business, which constituted the other half, did involve substantial repeat business. [11] This part of the business was not as profitable as the "walk-in" business, but, as Dr. Levy testified at trial, "that type of business, even though it's marginal profit business, can * * * defray costs in the laboratory, especially when you have automated pieces of equipment * * * *275 and also help us service our profitable business." Furthermore, goodwill has been held to encompass other elements in addition to a pool of regular customers. Factors in the growth and development of goodwill have been held to include "the economy of the region served" and "the competition." Friedlaender v. Commissioner,26 T.C. 1005, 1017 (1956). Similarly, the potential for competition in the immediate vicinity was considered in fixing the value of goodwill in Rubenstein v. Commissioner,10 B.T.A. 864, 865 (1928). We conclude that Wallach Lab's effective monopoly on laboratory services in the general area was itself an element of goodwill. We therefore disagree with Alden Lab's argument that there was no goodwill in the business. [12]
*276 Alden Lab argues in the alternative that if, as we have decided, the entire purchase price of $330,000 is allocable to the stock of Wallach Lab, then the covenant not to compete was an asset of Wallach Lab at the time the corporation was liquidated, and the covenant received a share of Alden Lab's basis in the stock under section 334(b)(2). We disagree. The parties to the contract in which the covenant was created were Alden Lab, Dr. Wallach, and Dr. and Mrs. Levy. Although the sale of the Wallach Lab stock to Alden Lab was part of the same agreement, we do not believe that the covenant was ever an asset of Wallach Lab. It was, instead, an asset of Alden Lab from its creation; consequently, it was not received by Alden Lab in the liquidation of Wallach Lab. Alden Lab also argues in the alternative that its entire basis of $330,000 in the stock of Wallach Lab should be allocated to the tangible assets received in liquidation of the corporation. Again, we disagree. As noted above, the fair market value of those assets was only $14,500. For the reasons discussed above, we believe that the excess of the purchase price over the value of the tangible assets is properly allocable *277 to intangible assets such as goodwill. In summary, we hold that Alden Lab has failed to prove that any part of the $330,000 paid for the stock of Wallach Lab is allocable to Dr. Wallach's covenant not to compete. Instead, we hold that the entire $330,000 was allocable to the stock of Wallach Lab and that, of that amount, $14,500 is assignable to tangible assets received by Alden Lab on liquidation of Wallach Lab, and the remainder is assignable to non-depreciable intangible assets. Issue 3. Additions to Tax
Section 6651(a)(1) provides for the imposition of an addition to tax for the failure to file a tax return on time "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." The burden of proving that the failure to file a return timely was due to reasonable cause is on the taxpayer. Bebb v. Commissioner,36 T.C. 170, 173 (1961); Rule 142(a). Late filing will be held to be due to reasonable cause if the taxpayer exercised "ordinary business care and prudence" in attempting to file timely. Section 301.6651-1(c)(1), Proced. *278 & Admin. Regs. Alden Lab does not dispute that its corporate income tax returns were filed late. It argues only that its reliance on its accountant to handle all of its tax affairs constituted reasonable cause for the late filings. We do not agree. As we stated in Paula Construction Co. v. Commissioner,58 T.C. 1055, 1061 (1972), affd. 474 F.2d 1345 (5th Cir. 1973), A taxpayer who has failed to file a timely return may demonstrate reasonable cause by showing that he acted in good-faith reliance upon the advice of an accountant to whom full disclosure of the relevant facts were made. West Coast Ice Co.,49 T.C. 345, 351 (1968); Safety Tube Corporation,8 T.C. 757 (1947), affd. 168 F.2d 787 (C.A. 6, 1948). However, the application of this principle is limited to situations where the taxpayer does not know whether certain tax returns are required, and therefore must rely on its accountant to resolve a complex question. Estate of Henry P. Lammerts,54 T.C. 420, 446 (1970), affirmed *279 per curiam 456 F.2d 681 (C.A. 2, 1972); Estate of Frank Duttenhofer,49 T.C. 200, 205, 206 (1967), affirmed per curiam 410 F.2d 302 (C.A. 6, 1969).Where the taxpayer is aware that a return is required, but delegates the responsibility of preparing it to a third person, the delegate's subsequent failure does not, alone, constitute reasonable cause. Logan Lumber Co. v. Commissioner,365 F.2d 846, 854 (C.A. 5, 1966), affirming a Memorandum Opinion of this Court; Inter-American Life Insurance Co.,56 T.C. 497, 511 (1971); Estate of Frank Duttenhofer,supra at 205. Alden does not argue that its president, Dr. Levy, was unaware that it was required to file annual corporate income tax returns, but only that the accountant whom he engaged to prepare the returns failed to do so on time. As indicated in the passage quoted above, this does not constitute reasonable cause for late filing. See also Latham Park Manor, Inc. v. Commissioner,69 T.C. 199, 219 (1977), affd. in unpublished opinion, 618 F.2d 100 (4th Cir. 1980); Mauldin v. Commissioner,60 T.C. 749, 762 (1973). *280 It does not appear from the record that anyone connected with Alden Lab saw a completed return or a request for an extension of the filing date until the returns were years overdue. As the court commented in United States v. Kroll,547 F.2d 393, 396 (7th Cir. 1977), "Any layman with the barest modicum of business experience knows that there is a deadline for the filing of returns and knows that he must sign the return before it is filed." In these circumstances, we do not believe that Alden Lab's reliance on the accountant's general representations that everything was being taken care of constituted ordinary business care and prudence. Accordingly, we sustain respondent's imposition of additions to tax for the years in question. Decisions will be entered under Rule 155 in docket Nos. 3795-79 and 19525-80.
Decisions will be entered for the petitioners in docket Nos. 871-79 and 15338-80.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Alden Bioclinical Laboratories, Incorporated, docket No. 3795-79; Jacques B. Wallach and Doris F. Wallach, docket No. 15338-80; and Alden Bioclinical Laboratories, Incorporated, docket No. 19525-80.↩
2. Statutory references are to the Internal Revenue Code of 1954, as amended, and references to "Rules" are to the Tax Court Rules of Practice and Procedure.↩
3. Dr. Levy's wife held the remaining shares. ↩
4. Dr. Levy testified that Alden Lab was "60-70 percent automated."↩
5. The Corporation's gross receipts from the clinical pathology portion of its business for the year ended January 31, 1972, were about $130,000. Its total gross receipts for that year were about $181,000.↩
6. Alden Lab's payments were scheduled over a period of five years.↩
7. Respondent disallowed these deductions in the notices of deficiency issued to Alden Lab, but he has since conceded that Alden Lab is entitled to depreciation deductions on the tangible assets in the amounts claimed.↩
8. In the present cases respondent has not taken the active role he apparently took in Freeport Transport, Inc. v. Commissioner,63 T.C. 107 (1974), in arguing against the allocation contained in the agreement. In fact, he has aligned himself with Dr. Wallach on brief and argued in favor of the allocation of all of the purchase price to the stock of Wallach Lab, as provided for in the agreement. Respondent has not, however, abandoned either of the inconsistent positions he took in the notices of deficiency. In particular, he has not abandoned his alternative argument that Dr. Wallach must treat $315,500 of the total purchase price as allocable to the covenant not to compete, contrary to the terms of the agreement. Accordingly, we believe that, just as in Freeport, the respondent "does not object to the presentation of evidence varying the terms" of the agreement in question. Freeport,supra↩ at 116. 9. Like the Danielson rule, the "strong proof" rule is subject to exception. For example, the rule does not apply when the meaning of the contract is unclear, and the parties do not seek to vary its terms, but merely to construe an obviously ambiguous term. Peterson Machine Tool, Inc. v. Commissioner,79 T.C. 72 (1982); Kinney v. Commissioner,58 T.C. 1038, 1043 (1972). See also Major v. Commissioner,76 T.C. 239, 247 n. 6 (1981). In the present cases, however, none of the parties argues that the terms of the sales agreement are ambiguous. Alden Lab merely argues that the agreement does not reflect the parties' actual intent. The exception for ambiguous contracts is, therefore, inapplicable. See also Numa Co. v. Commissioner,T.C. Memo. 1981-63↩, n. 3, and text associated therewith.
10. Carty v. Commissioner,38 T.C. 46, 58↩ (1962). 11. The repeat customers in this case were the referring physicians rather than the patients. ↩
12. We also note the sections in the contract of sale set forth above providing for Alden Lab's right to continued use of Wallach Lab's corporate name. The fact that this right was considered important enough to be included in the contract is an additional indication that there was goodwill in the business.↩